**Freddie HAMILTON, et al., Plaintiffs,**

v.

**ACCU–TEK, et al., Defendants.**

**No. CV–95–0049 (JBW).**

United States District Court,
E.D. New York.

June 3, 1999.

---

Elisa Barnes, Weitz & Luxenberg by Denise M. Dunleavy, Schulte Roth & Zabel, LLP, New York, NY, by Mark E. Elovitz, Michael S. Feldberg, for Plaintiffs.

Wildman, Harrold, Allen & Dixon, Chicago, IL by James P. Dorr, Anne Giddings Kimball, for Defendants Sturm, Ruger, Colt's Manufacturing, Smith & Wesson.

Pino & Associates, Westchester Financial Center, White Plains, NY by Lawrence G. Keane, for Defendants Beretta USA Corp., Beretta Firearms.

Cozen & O'Connor, Atlanta, GA by Timothy A. Bumann, for Defendants Taurus, Bryco, Jennings, American Derringer, Lorcin, Sundance and others.

Renzulli & Rutherford, New York, NY by John F. Renzulli, Leonard S. Rosenbaum, Fred E. Scharf, for Defendants Accu–Tek, Arcadia Machine & Tool Co., Inc., Browning Arms Co., Davis Industries, Inc., European American Armory Corp., Freedom Arms, Glock, Inc., H & R 1871, Inc., K.B.I., Inc., Mitchell Arms, Inc., Navegar, Inc. d/b/a Intratec, Olympic Arms, Inc., Para–Ordnance Mfg., Inc., Springfield, Inc. and Thompson/Center Arms Co.

Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, New York, NY by Daniel T. Hughes, Erin A. O'Leary, for Defendant American Arms.

Wilson, Elser, Moskowitz, Edelman & Dicker, New York, NY by Robert L. Joyce, for Defendant Sigarms, Inc.

## AMENDED MEMORANDUM, ORDER AND JUDGMENT

WEINSTEIN, Senior District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ................................................. 808

II. FACTS ......................................................... 808
 A. Stephen Fox ............................................... 808
 B. Njuzi Ray ................................................. 809
 C. Roberto Robles ............................................ 809
 D. Leroy Sabb ............................................... 809
 E. Damon Slade ............................................. 809
 F. Kei Sunada................................................ 809
 G. Marvin Zaretsky .......................................... 810

III. PROCEDURAL HISTORY........................................ 810
 A. Pre–Trial Proceedings ..................................... 810
 B. Claims of Parties and Jury Instructions .................... 810
 C. Verdicts ................................................. 811
 1. Negligence ......................................... 811
 2. Proximate Cause .................................... 811
 3. Damages ........................................... 811
 a. Veronica Trott and Koichi Sunada .......... 811
 b. Stephen Fox ................................. 811
IV. LAW AND ITS APPLICATION ................................... 812
 A. Motion to Dismiss—Collateral Estoppel..................... 812
 1. Law ............................................... 812
 2. Application ......................................... 814
 B. Motion to Amend Pleadings ................................ 815
 1. Law ............................................... 815
 2. Application ......................................... 817
 C. Motion for Judgment as a Matter of Law.................... 817
 D. Negligence ............................................... 818
 1. Duty............................................... 818
 a. Law................................................ 818
 i. Liability for the Acts of Third Parties .......... 819
 ii. Duties of Manufacturers ...................... 822
 b. Application........................................ 824
 2. Breach ............................................. 827
 a. Law................................................ 827
 b. Application........................................ 829
 3. Causation .......................................... 833
 a. Law................................................ 833
 i. Proximate Cause .............................. 833
 ii. Intervening Cause ............................ 833
 iii. Mass Tort Causation .......................... 834
 b. Application........................................ 835
 4. Apportionment of Liability........................... 839
 a. Law................................................ 839
 i. Available Theories ............................ 839
 ii. Policy Considerations ......................... 841
 b. Application........................................ 843
 5. Damages ........................................... 846
 a. Law................................................ 846
 b. Application........................................ 846

V. NEW TRIAL .................................................. 847

VI. CERTIFICATION .............................................. 847

VI. CONCLUSION ................................................ 848

APPENDIX A—RELEVANT PORTIONS OF JURY INSTRUCTIONS . . . . . . . . 848

APPENDIX B—VERDICT FORM FOR STEPHEN AND GAIL FOX AS COMPLETED BY JURY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 850

## I. INTRODUCTION

Relatives of six people killed by handguns, as well as one injured survivor and his mother, have sued twenty-five handgun manufacturers for negligence. They claim that the manufacturers' indiscriminate marketing and distribution practices generated an underground market in handguns, providing youths and violent criminals like the shooters in these cases with easy access to the instruments they have used with lethal effect.

Defendants collectively supply most of the United States market for handguns. Among them are foreign manufacturers (e.g., Para Ordnance Manufacturing, Inc.), United States subsidiaries of foreign corporations (e.g., Browning Arms Co., Beretta U.S.A. Corp. and Smith & Wesson Corp.), old-line domestic manufacturers (e.g., Colt's Manufacturing, and Sturm, Ruger & Co.), and newer gun makers specializing in the manufacture of inexpensive small and medium caliber semiautomatic pistols (e.g., Jennings Firearms, Bryco Arms, and Davis Industries). *See generally* Tom Diaz, *Making a Killing: The Business of Guns in America* 3–35 (1999); Garen J. Wintemute, M.D., *The Relationship Between Firearm Design and Firearm Violence*, 275 JAMA 1749 (1996).

Plaintiffs' claims raise novel issues of duty and of collective liability under governing New York state law. For this reason, it is respectfully recommended that the Court of Appeals for the Second Circuit certify these substantive law questions to the New York Court of Appeals for definitive resolution.

After a four-week trial, the jury found negligent fifteen of the defendants; nine of them were found to have proximately caused injury to one or more plaintiffs. Damages were found only in favor of plaintiff Steven Fox and his mother, Gail Fox,

against American Arms, Inc. (.23% liability), Beretta U.S.A. Corp. (6.03% liability), and Taurus International Manufacturing, Inc. (6.8% liability).

Three motions are currently pending: defendants' motion to dismiss on the ground of collateral estoppel, defendants' Rule 50(b) motion for judgment as a matter of law, and plaintiffs' Rule 15(b) motion to amend the pleadings to conform to the proof. For reasons set forth below, defendants' motions must be denied, and plaintiffs' amendment granted.

Default judgments were awarded by the court in favor of two of the plaintiffs, Veronica Trott and Maria Santana, for 100% of their damages against Cobray Firearms, Inc., which failed to appear or answer. *See Hamilton v. Accu–Tek*, 1999 WL 169523, at *1 (E.D.N.Y. Feb. 17, 1999). The court found that the gun was manufactured by Cobray and that the plaintiffs did suffer damages. These independent findings by the court do not control evaluation of the evidence by the jury in the instant case. *See Joseph v. New York City Bd. of Educ.*, 171 F.3d 87, 93 (2d Cir.1999) ("The fact that there may have been evidence to support an inference contrary to that drawn by the trier of fact does not mean that the findings were clearly erroneous.").

## II. FACTS

### A. Stephen Fox

Stephen Fox was shot in Queens, New York on November 14, 1994. He was sixteen years old at the time, as was his friend, the shooter, Alfred Adkins, Jr. Mr. Fox survived, but a bullet remains lodged in his brain, causing severe permanent disability. There was evidence that the handgun Mr. Adkins used had been bought by him a short time before the shooting from a seller—unlikely to have been licensed—

who declared it came from "the south" when he dispensed it from the trunk of a car.

Charged initially with attempted murder, Mr. Adkins later pled guilty to reckless endangerment in Queens County Family Court. A .25 caliber spent cartridge case was recovered from the crime scene. The gun used to shoot Mr. Fox was never found. Mr. Adkins testified at his deposition that he did not recall how he came to possess it.

Suit was initially brought by Gail Fox, Mr. Fox's mother and guardian. When Mr. Fox attained his majority, he was substituted as plaintiff. Ms. Fox remained in the case, suing on her own behalf for loss of her son's services and for her own nursing care of him.

### B. Njuzi Ray

Njuzi Ray was shot and killed in Brooklyn, New York on July 27, 1993. He was seventeen years old. The shooting appears to have resulted from a dispute about girlfriends. It occurred as Mr. Ray and his friends walked toward Reginald Cooper's home in an attempt to settle the disagreement. Mr. Cooper was charged with murder, but was subsequently acquitted. The handgun used in the shooting was never recovered. 9 millimeter casings and one 9 millimeter caliber bullet were retrieved from the crime scene. An additional 9 millimeter caliber bullet was removed from Mr. Ray's body during the autopsy.

Mr. Ray's mother, Freddie Hamilton, sued for her son's estate.

### C. Roberto Robles

Roberto Robles was shot and killed in Bronx, New York on March 23, 1994. He was sixteen years old. Four people were arrested and convicted of murder for their participation in the shooting. It seems to have resulted from a fight after a baseball game two days earlier. Recovered from the crime scene was a 9 millimeter pistol manufactured by Cobray Firearms, Inc.

Mr. Robles' mother, Maria Santana, sued for her son's estate.

### D. Leroy Sabb

Leroy Sabb was shot and killed in Bronx, New York on October 13, 1993, after having been chased by five unknown assailants. He was seventeen years old.

The handgun used in the killing was not found, but 9 millimeter expended bullets and shell casings were recovered from the scene.

Mr. Sabb's mother, Veronica Trott, sued for her son's estate.

### E. Damon Slade

Damon Slade was eighteen years old at the time he was shot and killed on December 10, 1993. The shooter, Harry Eberhart, confronted Mr. Slade and three others in the elevator of an apartment building in Yonkers, New York. After preventing the elevator doors from closing he opened fire, killing Mr. Slade and one of his companions and wounding others. Mr. Eberhart was tried and convicted of the murder of Mr. Slade. The handgun Mr. Eberhart used in the killing was not found, but 9 millimeter spent casings and bullets were recovered from the scene. Mr. Eberhart testified at his deposition that he had used a 9 millimeter Hi–Point pistol to shoot Mr. Slade. He also testified that he fled after the shooting and hid the gun in some bushes.

Mr. Slade's mother, Andrea Slade–Lewis, sued for her son's estate.

### F. Kei Sunada

Kei Sunada was twenty-two years old when he was shot and killed on August 7, 1994 during the course of a robbery in either the elevator or the stairwell of the apartment building where he lived in Queens, New York. The gun was not found. A spent .380 caliber bullet and cartridge casing where recovered. Ar-

mond McCloud, Jr. was convicted of murder. His accomplice, Reggie Cameron was convicted of robbery.

Mr. Sunada's father, Koichi Sunada sued for his son's estate.

### G. Marvin Zaretsky

Marvin Zaretsky was shot and killed on June 25, 1994 during a robbery in the parking lot of a convenience store in Queens, New York. He was 49 years old. His three assailants were arrested and indicted on charges of second degree murder, robbery, and criminal possession of a weapon; two of the three pled guilty, and a third, previously convicted of manslaughter, is awaiting trial. Two .380 caliber casings and two .380 caliber bullets were recovered from the scene, but the gun used to shoot Mr. Zaretsky was never found.

Mr. Zaretsky's wife, Diane Zaretsky, sued for her husband's estate.

## III. PROCEDURAL HISTORY

### A. Pre-Trial Proceedings

In actions filed in January 1995, two plaintiffs sued numerous handgun manufacturers asserting claims of negligent marketing, design defect, ultrahazardous activity and fraud. A number of defendants jointly moved for summary judgment in April 1995. The court dismissed plaintiffs' product liability and fraud claims but allowed them to proceed on a negligent marketing theory. *See Hamilton v. Accu–Tek*, 935 F.Supp. 1307, 1315 (E.D.N.Y. 1996).

Additional plaintiffs intervened in April 1996 after the court granted leave to amend the Complaint to add plaintiffs. In May 1996, defendants again moved for summary judgment on plaintiffs' remaining negligence claim. The motion was denied on the ground that while substantial discovery had taken place on the issue of collective liability, discovery on defendants' underlying negligence claim was not yet complete. *See id.* at 1329–30. A petition

for a writ of mandamus was denied by the Second Circuit. *See Hamilton v. Accu–Tek* (2d Cir. August 5, 1996) (order denying mandamus).

In June 1996, actions were commenced against a number of handgun distributors. All but two of the distributor defendants moved to dismiss for lack of personal jurisdiction. *See* Fed.R.Civ.P. 12(b)(2). The motion was denied as to fifteen distributors. *See Hamilton v. Accu–Tek*, 32 F.Supp.2d 47 (E.D.N.Y.1998).

A motion to dismiss or transfer one case on the ground of lack of diversity was denied. *See Hamilton v. Accu–Tek*, 13 F.Supp.2d 366 (E.D.N.Y.1998).

At the close of discovery, defendants renewed their motion for summary judgment. It was denied. *See Hamilton v. Accu–Tek*, 1998 WL 903473 (E.D.N.Y. Dec.18, 1998).

Two plaintiffs' cases, *Johnstone v. Accu–Tek* and *Costa v. Accu–Tek*, were transferred to federal courts in California and Virginia, respectively, based on conflict of laws and other considerations. *See Hamilton v. Accu–Tek*, 1999 WL 167672 (E.D.N.Y. Jan.22, 1999).

The case proceeded to trial in January 1999. At the suggestion of the court during the trial, plaintiffs voluntarily dismissed all claims against the distributors.

Related gun cases, other than those tried, are still pending in this court. They were stayed until completion of trial and appeal in the instant cases.

### B. Claims of Parties and Jury Instructions

Plaintiffs claim that defendants marketed and distributed handguns negligently, proximately causing each of the seven shootings at issue.

Defendants deny having marketed or distributed handguns negligently and deny responsibility for any of the plaintiffs' injuries. They contend that the sole proximate cause of the murders and shootings

in these cases was criminal conduct on the part of the shooters and others.

The relevant portions of the charge on the law and of one of the jury verdict forms utilized are attached as Appendices A and B, respectively.

### C. Verdicts

#### 1. Negligence

In each of the seven cases, fifteen defendants were found to have marketed or distributed handguns negligently: (1) American Arms, Inc., (2) Arcadia Machine & Tool, Inc., (3) Beretta U.S.A. Corp., (4) Bryco Arms, (5) Calico Light Weapons Systems, Inc., (6) Colt's Manufacturing, Inc., (7) Freedom Arms Co., (8) Glock, Inc., (9) International Armament Corp., d/b/a/ Interarms Industries, Inc., (10) Jennings Firearms, Inc., (11) K.B.I., Inc., (12) Phoenix Arms, Inc., (13) Sigarms, Inc., (14) Sundance Industries, Inc., and (15) Taurus International Manufacturing, Inc.

#### 2. Proximate Cause

No defendant was found liable for the injuries of plaintiffs Andrea Slade–Lewis, Maria Santana, Freddie Hamilton or Diane Zaretsky.

With regard to the remaining three plaintiffs, the jury found proximate causation and apportioned damages as follows:

*Veronica Trott*

American Arms, Inc. (.23%)

Arcadia Machine & Tool, Inc. (.85%)

Beretta U.S.A. Corp. (6.03%)

Bryco Arms (5.29%)

Colt's Manufacturing Co., Inc. (4.14%)

Glock, Inc. (4.29%)

Phoenix Arms, Inc. (1.3%)

Sigarms, Inc. (0%)

Taurus International Manufacturing, Inc. (6.8%)

*Koichi Sunada*

American Arms, Inc. (.23%)

Arcadia Machine & Tool, Inc. (.85%)

Colt's Manufacturing, Inc. (4.14%)

Taurus International Manufacturing, Inc. (6.8%)

*Stephen and Gail Fox*

American Arms, Inc. (.23%)

Beretta U.S.A. Corp. (6.03%)

Taurus international Manufacturing, Inc. (6.8%)

#### 3. Damages

##### a. Veronica Trott and Koichi Sunada

In the Trott and Sunada cases, the jury found negligence and proximate cause, but no damages. A finding of no damages was not inconsistent with the evidence.

In the case of Mr. Trott, whose estate sought damages only for conscious pain and suffering, the jury could have found instantaneous death with no pain or suffering. In that of Mr. Sunada, it could have found immediate loss of consciousness with no pain or suffering. Such findings could have supported the jury's conclusion that no damages should have been awarded in either case for injury suffered during the lifetime of the deceased.

The evidence could also have been evaluated by the jury to support a conclusion that Mr. Sunada would not have added to the value of his estate. A funeral bill for Mr. Sunada was in evidence, but the jury could have concluded that payment of the bill by the estate had not been established by a preponderance of the evidence.

##### b. Stephen Fox

With respect to Stephen Fox and Gail Fox, the jury calculated total damages of $3,950,000 and $50,000 respectively, to be assessed against the three defendants found liable in the percentages indicated above—.23, 6.03, and 6.8.

Since a verdict of negligence requires proof of damages, only the Fox defendants have legal reason to contest the verdict. The complaint is dismissed against all oth-

er defendants. There is no basis for their Rule 50(b) motions.

## IV. LAW AND ITS APPLICATION

■ A federal court sitting in diversity applies the substantive law of the forum state, including that state's choice-of-law rules, and federal procedural law. *Erie R.R. v. Tompkins*, 304 U.S. 64, 80, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Hamilton v. Accu–Tek*, 1999 WL 167672, at *3 (E.D.N.Y. Jan.22, 1999). The decisional law of the forum's highest courts and that state's constitution and legislative enactments are to be afforded the greatest weight in determining the applicable state rule.

■ On state law issues of first impression, the district court must predict how the highest state court would rule were it presented with the same question. In making such a prediction, the precedents of intermediate state and federal courts are entitled to deference. *See, e.g., Competex, S.A. v. Labow*, 783 F.2d 333, 341 n. 16 (2d Cir.1986); *In re Eastern and Southern Districts Asbestos Litig.*, 772 F.Supp. 1380, 1388 (E.D.N.Y.1991), *aff'd in part, rev'd in part on other grounds sub nom. In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831 (2d Cir.1992); Jed I. Bergman, Note, *Putting Precedent in its Place: Stare Decisis and Federal Predictions of State Law*, 96 Colum. L.Rev. 969 (1996); Nikoforos Matthews, Note, *Circuit Court Erie Errors and the District Court's Dilemma: From Rotolith and the Mirror Image Rule to Octagon Gas and Asset Securitization*, 27 Cardozo L.Rev. 739 (1996).

### A. Motion to Dismiss—Collateral Estoppel

In October 1996, Lorcin Engineering, Inc., then a defendant in the instant cases, filed for bankruptcy in California. Plaintiffs intervened in the bankruptcy proceeding as creditors. A hearing on Lorcin's objections to plaintiffs' claims was held in October 1997. The bankruptcy judge concluded that plaintiffs had failed to establish the existence of a legal duty and disallowed their claims. This decision was approved by the district judge. *See In re Lorcin Engineering Co.*, No. RS96–27640–RA (Bankr.C.D.Cal. Feb. 17, 1998) (ordering disallowing claim of Hamilton, et al.). Plaintiffs did not appeal from this determination.

Almost one year later, in January 1999, defendants moved to dismiss on the ground that the California bankruptcy judge's decision and the district judge's affirmance collaterally estopped plaintiffs from litigating their negligence claims in this court. Defendants' motion is without merit.

#### 1. Law

■ While the parties cite to New York issue preclusion law, because bankruptcy courts are federal courts of specific jurisdiction, federal law applies. "When a prior action is decided under federal question jurisdiction, it is clear that federal law is used to determine its res judicata effect." *Carlin v. Gold Hawk Joint Venture*, 778 F.Supp. 686, 690 (S.D.N.Y.1991); *see also Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 41–42 & n. 3 (2d Cir.1986), *cert. denied*, 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987) (applying federal preclusion law where the previous action was in federal court under federal question jurisdiction, and extending it to prior diversity jurisdiction judgments in dicta); *id.* ("It would seem that federal courts must possess an equivalent power and that federal law should determine the preclusive effect of a federal judgment, without regard to the basis of jurisdiction.").

■ Collateral estoppel's main purposes are to avoid unnecessary relitigation and inconsistencies among court rulings:

It protects litigants from the burden of relitigating an issue which the other party has already litigated and lost. It promotes judicial economy by prevent-

ing needless litigation. Finally, it fosters reliance on judicial action by minimizing the possibility of inconsistent decisions. *Southern Pac. Communications Co. v. American Tel. & Tel. Co.,* 740 F.2d 1011, 1019 (D.C.Cir.1984) (internal quotation marks and citations omitted).

Collateral estoppel does apply to decisions rendered by the bankruptcy courts. *See United States v. Alfano,* 34 F.Supp.2d 827, 832 (E.D.N.Y.1999). The doctrine, however, "has been narrowly tailored to ensure that it applies only where circumstances indicate the issue estopped from further consideration was thoroughly explored in the prior proceeding, and that the resulting judgment thus has some indicia of correctness." *Johnson v. Watkins,* 101 F.3d 792, 795 (2d Cir.1996).

 Four requirements for establishing collateral estoppel limit the doctrine to cases where applying it is not unfair:

(1) the issues at both proceedings must be identical; (2) the relevant issues were actually litigated and decided in the prior proceeding; (3) there must have been full and fair opportunity for litigation of the issues in the prior proceeding; and (4) the issues were necessary to support a valid and final judgment on the merits.

*Alfano,* 34 F.Supp.2d at 834 (citing *Central Hudson Gas & Elec. v. Empresa Naviera,* 56 F.3d 359, 368 (2d Cir.1995)). The party invoking collateral estoppel has the burden with regard to each of these elements. *See id.* (citing *Dowling v. United States,* 493 U.S. 342, 350, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)). A significant change in "controlling facts or legal principles since the prior judgment [or] other special circumstances [may] warrant an exception to the normal rules of preclusion." *Id.* (citing *Montana v. United States,* 440 U.S. 147, 155, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)). Application of collateral estoppel is ultimately a decision entrusted to the "trial courts' sense of justice and equity." *Blonder–Tongue Lab., Inc. v. Univ. of Ill.*

*Found.,* 402 U.S. 313, 334, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

██ Even where an issue has been actually litigated and finally decided and was necessary to the judgement rendered in a prior proceeding, a party will be barred from relitigating it only if the initial opportunity to litigate was "full and fair." *See Metromedia Co. v. Fugazy,* 983 F.2d 350, 365 (2d Cir.1992); *see also Irish Lesbian & Gay Org. v. Giuliani,* 143 F.3d 638, 646 (2d Cir.1998). Of primary importance in determining whether a prior proceeding afforded a "full and fair opportunity to litigate" is whether the party against whom preclusion is sought had an incentive to try the case vigorously in that forum. *See* 18 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 4465, at 598 (1981). ("One of the great fears that has always been urged against nonmutual preclusion has been that a party will be bound in unforeseen ways by half-hearted litigation of an apparently trivial claim.").

As the Restatement recognizes, a minor skirmish does not have to be fought to the death while the main dispute awaits decision:

There are many reasons why a party may choose not to raise an issue or contest an assertion in a particular action. The action may involve so small an amount that litigation of the issue may cost more than the value of the lawsuit. Or the forum may be an inconvenient one in which to produce the necessary evidence.

Restatement (Second) of Judgments § 27 cmt. e (1982). *See also, e.g., Remington Rand Corp. v. Amsterdam–Rotterdam Bank,* 68 F.3d 1478, 1486 (2d Cir.1995) (lack of incentive to litigate is of particular concern "where the party against whom estoppel is sought had little warning during the first suit that the issues being decided might become binding against it in later litigation"); *The Evergreens v. Nunan,* 141 F.2d 927, 929 (2d Cir.), *cert. denied,* 323 U.S. 720, 65 S.Ct. 49, 89 L.Ed.

579 (1944) (Hand, J.) ("Defeat in one suit might entail results beyond all calculation by either party; a trivial controversy might bring utter disaster in its train. There is no reason for subjecting the loser to such extravagant hazards.").

### 2. Application

■ Neither the public interest in judicial economy nor litigants' interest in avoiding the expense and burden of relitigating decided issues is implicated here. This is not a case in which an issue was litigated and finally determined in one forum and attempts are now made to relitigate it in another, unnecessarily burdening the courts and causing a "misallocation of resources." *Blonder–Tongue Lab., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 329, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). By the time of the hearing before the bankruptcy judge, the plaintiffs' claims had already been pending in the Eastern District of New York for almost three years. Discovery, though not yet complete, had been substantial. Pre-trial motions had been briefed, argued and decided. In addition, defendants waited almost a year after entry of the bankruptcy order disallowing plaintiffs' claims against Lorcin before asserting collateral estoppel in a motion filed two days before the start of trial. During this time they continued to engage in discovery and to file and argue motions, further obviating the need for what is essentially an equitable remedy designed to reduce burden and expense.

The California bankruptcy hearing was a sideline proceeding against one defendant in a court located across the country. Their small stake in that proceeding and the inconvenience of the California forum gave plaintiffs little incentive to litigate the duty issue. Plaintiffs did not choose the location of the west coast forum, but were compelled to intervene there if they were to have any hope of recovering against Lorcin. "It may be proper to deny preclusion if the first action occurred in an inconvenient forum that made it impossible to engage in full discovery or to call wit-

nesses." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 n. 15, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

While plaintiffs may have suspected that disallowance of their claim by the bankruptcy judge would bar them from pursuing Lorcin in another court, *see In re Lorcin Engineering Co.*, No. RS96–27640–RA, Transcript of Proceedings Before the Honorable Robert W. Alberts, United States Bankruptcy Judge, October 28, 1997 ("Bankr.Tr."), at 71, they could not have anticipated the possibility that it might bind them in the ongoing complex New York litigation against Lorcin's many non-bankrupt co-defendants. That plaintiffs did not contemplate any potential preclusive effect of the bankruptcy proceeding on their New York suit is evidenced by lead counsel's decision not to attend the California hearing and not to appeal the bankruptcy decision. Even if plaintiffs had realized the desirability of litigating fully the duty issue before the California bankruptcy court, it is doubtful whether their limited resources—already fully committed to the New York lawsuit—would have warranted such full-scale bicoastal litigation.

The limited nature of the bankruptcy hearing and lack of preparation by plaintiffs' local counsel further militate against preclusion. *See* 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *supra*, § 4465, at 600–02. ("Preclusion may also be denied by showing that . . . counsel was incompetent . . . or that the issues were not in fact extensively litigated."). The bulk of the bankruptcy hearing was devoted to a discussion of the bankruptcy court's power to dispose of plaintiffs' tort claims. The bankruptcy judge repeatedly expressed doubt on this score. *See, e.g.,* Bankr.Tr. at 8–9 ("Congress perceives personal injury tort and wrongful death cases as being clearly something that has to be decided at the Article III court rather than the Article I court level. And far be it from me to argue with it as an Article I

judge."); *id.* at 11 ("I'm not inclined to spend a lot more time second-guessing the district court in New York .... I mean that litigation is pending, it hasn't been thrown out. And I don't think you should assume that this Bankruptcy Court is going to, in effect, throw it out while that court hasn't."); *id.* at 17 ("I don't think I have jurisdiction to do this"); *id.* at 19 ("I don't want to spend a lot of time where I'm firmly—or fairly firmly convinced that this Court doesn't have the jurisdiction to say on the merits, in effect, liquidating that claim you can't—I mean you get zero because you can't state a claim for relief because there's no duty, for example."). *See generally In re Dow Corning Corp.,* 215 B.R. 346, 349–51 (Bankr.E.D.Mich. 1997) (collecting cases representing opposing views of bankruptcy courts' jurisdiction to disallow personal injury claims as a matter of law).

Once the bankruptcy judge did address the merits of the duty issue, plaintiffs' local counsel referred a number of times to her inability to litigate the matter fully due to her incomplete knowledge of New York law. *See, e.g.,* Bankr.Tr. at 57 ("As a preliminary matter, Your Honor, let me simply say that if you are asking me to argue New York law, I do not feel that I am prepared or competent to do that today ...."); *id.* at 52 ("I'm sorry that I'm not as well versed as [lead counsel] would be in citing cases to you.").

The bankruptcy judge did ultimately decide to disallow the plaintiffs' claims against Lorcin in their entirety. *See id.* at 65. He denominated the disallowance a "non-core proceeding," requiring entry of a final order and judgment by the district court. The conclusory three-page Findings of Fact and Conclusions of Law reflects the incomplete nature of the litigation and militates against giving the decision any preclusive effect.

Finally, the unique circumstances presented by the instant litigation warrants denial of defendants' motion. In a case involving complex and novel questions of national import, in which the tort law of another state is decisive, discovery is not yet complete and the theory of the case is still evolving, a bankruptcy court's summary findings cannot be permitted to preclude the plaintiff from a recovery on the merits after a full trial. Defendants' motion to dismiss on the ground of collateral estoppel must be denied.

### B. Motion to Amend Pleadings

Plaintiffs moved pursuant to Rule 15(b) to amend their Second Amended Complaint to conform to the proof at trial concerning defendants' liability under a national market share theory. Defendants oppose the motion on three grounds: first, that the market share issue was tried without their express or implied consent, second, that the amendment would prejudice them, and third, that permitting the amendment would be "futile" since market share liability is inapplicable to the instant cases. The issues of consent and prejudice are addressed in this part. Defendants' "futility" argument goes to the merits of the applicability of market share liability; it is better addressed in the context of defendants' motion for judgment as a matter of law. *See* Part IV, *infra.*

#### 1. Law

Rule 15(b) of the Federal Rules of Civil Procedure provides for amendment of pleadings to reflect the proof at trial. It states in pertinent part:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings ... may be made upon motion of any party at any time, even after judgment....

Amendment of the pleadings pursuant to Rule 15(b) is a part of the general federal policy of limiting the restrictive effect of historical pleading rules. *See generally* 6A Charles Alan Wright, Arthur R. Miller, &

Mary Kay Kane, *Federal Practice & Procedure* § 1491 (1990).

■ Determination of a Rule 15(b) motion is entrusted to the sound discretion of the trial court, informed by the general principle that amendments should be "freely given when justice so requires." Fed.R.Civ.P. 15(a). *See Hillburn v. Maher*, 795 F.2d 252, 264 (2d Cir.1986). The crux of the inquiry is whether the nonmoving party had an opportunity fully to contest the issue included in the amendment. *See New York State Elec. & Gas Corp. v. Secretary of Labor*, 88 F.3d 98, 104 (2d Cir.1996) ("In assessing whether pleadings should conform to the proof, the pivotal question is whether prejudice would result."); *see also Cunningham v. Quaker Oats Co.*, 107 F.R.D. 66, 71 (D.C.N.Y.1985) ("restrictions upon amendments exist chiefly to prevent confusion, delay, and the chance that a party will find itself on the short end of a judgment without having been given a fair opportunity to defeat the claims asserted against it.").

Decision of a motion to amend on a trial record is a two-step process. *See, e.g.*, during the trial that an unpled issue was being tried. *See United States v. Certain Real Property and Premises Known as 890 Noyac Road*, 945 F.2d 1252, 1257–59 (2d Cir.1991); *Hillburn*, 795 F.2d at 264; *Al–Jundi v. Oswald*, 1995 WL 353159, at *1 (W.D.N.Y. June 6, 1995).

■ The first step is to inquire whether the non-moving party expressly or impliedly consented to trial of the unpled issue. If the answer is yes, the proponent of the motion is entitled to mandatory amendment of the pleadings. *See Hillburn*, 795 F.2d at 264. Implied consent exists where the parties recognized during the trial that an unpled issue was being tried. *See, e.g., Certain Real Property*, 945 F.2d at 1257; *Kirkland v. District of Columbia*, 70 F.3d 629, 633–34 (D.C.Cir. 1995) (finding consent where "parties understood that [the issue] was being contested"); *see also* 6A Charles A. Wright,

Arthur R. Miller & Mary Kay Kane, *supra*, § 1493, at 19.

■ The second step is to ask whether amendment would prejudice the non-movant. *See, e.g., Certain Real Property*, 945 F.2d at 1259. The court has discretion to grant a Rule 15(b) motion even in the absence of express or implied consent "so long as [the nonmoving party] would not thereby be prejudiced, and [the motion] 'should be granted in the absence of such prejudice if the interests of justice so require.' " *Sudul v. Computer Outsourcing Svcs.*, 917 F.Supp. 1033, 1041 (S.D.N.Y. 1996) (quoting *Hillburn*, 795 F.2d at 264). Prejudice exists if the opponent could have tried the case substantially more effectively—as by presenting further evidence, calling additional witnesses or taking depositions—had it known of the amendment earlier. *In Royal American Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1017–18 (2d Cir.1989), for example, the court found that granting plaintiff's 15(b) motion would be prejudicial since plaintiff's "inexcusable tardiness" had prevented defendants from retaining an expert in defense of the amended claim, preparing and presenting other relevant evidence, and addressing the issue in opening statements and through earlier and crucial witnesses. *See also Grand Light & Supply Co. v. Honeywell, Inc.*, 771 F.2d 672, 680 (2d Cir.1985) (finding prejudice where evidence from which plaintiff inferred trial of and consent to the amended issue was relevant to a pled issue and defendant would likely have introduced further evidence had the unpled issue been tried).

Prejudice is not presumed to result merely from a party's use of a new legal theory. *See, e.g., New York State Electric & Gas Corp. v. Secretary of Labor*, 88 F.3d 98, 104 (2d Cir.1996) (amendment to change theory of safety infraction to an "analogous" and fully litigated one was non-prejudicial); 6A Wright, Miller & Kane, *supra* § 1493 at 47–48 ("the theory of liability upon which the case nominally was to be tried may be changed [under

15(b) ]"); *cf. DCPB, Inc. v. City of Lebanon*, 957 F.2d 913, 917(1st Cir.1992) (plaintiff's proposed amendment of complaint to add a tort claim to its contract cause of action in order to justify "enhanced damages" awarded by the jury but impermissible under the applicable state contract law was prejudicial because it "attempt[ed] to superimpose a new (untried) theory on evidence introduced for other purposes").

### 2. Application

■ Market share liability was introduced early in the case. *See, e.g., Hamilton v. ACCU–TEK*, 935 F.Supp. 1307, 1331 (E.D.N.Y.1996) (noting likelihood of adoption of market share liability and discussing New York's approach to the theory). Its applicability was contested in pre-trial motions and was thoroughly litigated during the trial. *See, e.g.,* Transcript of Oral Argument of Summary Judgement Motion, Dec. 17, 1998, at 15 (defendants note that "[p]laintiff attempts to come under the DES case, the *Hymowitz* case"); *id.* at 32 (defendants note that this is a case "where the plaintiff wants to apply collective liability; in this case market share liability"); *id.* at 38 (defendants' argue that plaintiffs' market share theory should not be applied in this case because the theory has never been applied "to any other product other than DES"); *id.* at 51 (defendants argue that court should consider exculpation should it decide that "some form of market share liability" applies); *id.* at 80–82 (extended discussion by plaintiffs of market share and *Hymowitz*); Tr. (trial) at 2045 (objecting to imposition of any form of market share liability and arguing that market share makes "no sense" in this "conduct-based" case).

Consent does not entail the non moving party's permission—implied or express— to trial of the unpled issue. It depends, as noted, on the opponent's awareness that the issue was being litigated. On the record, defendants' position that their numerous objections to the trial of market share issues precludes a finding of consent is untenable. The case was tried on a variation of negligence theory foreseen throughout the litigation.

There was no prejudice. As the court of appeals for the Second Circuit has held:

> a party cannot normally show that it suffered prejudice simply because of a change in its opponent's legal theory. Instead, a party's failure to plead an issue it later presented must have disadvantaged its opponent in presenting its case.

*New York State Elec. & Gas Corp. v. Secretary of Labor*, 88 F.3d 98, 104 (2d Cir. 1996). Here, no disadvantage has been demonstrated. Defendants have pointed to no uncalled witnesses, unpresented evidence or compromised opening or closing arguments. *See, e.g., Royal American Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1017–18 (2d Cir.1989). Not only did defendants avail themselves of every possible opportunity to litigate the market share issue, they retained an expert, Dr. Benston, who prepared and proffered evidence as to market share statistics in both his deposition and at trial. *See* Rule 26 Report of Def's Expert Benston (Oct. 15, 1998) at 18–19, Table 5, Table 6; Tr. (trial) 3069–72.

This Rule 15(b) motion falls squarely within the rule that "if it is clear that the parties understand exactly what the issues are when the proceedings are had, they cannot thereafter claim surprise or lack of due process because of alleged deficiencies in the language of particular pleadings." *Kuhn v. Civil Aeronautics Bd.*, 183 F.2d 839, 841 (D.C.Cir.1950). Plaintiffs' motion to amend the pleadings is granted.

### C. Motion for Judgment as a Matter of Law

At the close of plaintiffs' case, defendants moved, pursuant to Rule 50(a), for judgment as a matter of law. Decision was reserved, and the motion was renewed post-verdict pursuant to Rule 50(b). Defendants argue that (1) they owed the plaintiffs no legal duty; (2) the evidence is

insufficient to support the jury's findings of negligence and proximate cause; (3) market share liability does not apply; and (4) plaintiffs' proof with respect to market share was inadequate to support the jury charge and verdict.

After a verdict, the district court may, as appropriate, either allow the judgment to stand, order a new trial, or direct entry of judgment as a matter of law. Fed. R.Civ.P. 50(b).

■ In determining whether to grant a Rule 50(b) motion, the evidence must be viewed in the light most favorable to the non-movant. *See LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 429 (2d Cir.1995), *cert. denied sub nom. Village of Airmont v. LeBlanc–Sternberg,* 518 U.S. 1017, 116 S.Ct. 2546, 135 L.Ed.2d 1067 (1996). The party defending the verdict must be given "the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." *Id.; see also* 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2528, at 288 (1995)(party against whom a motion is made is entitled to "every legitimate inference that can be drawn from the evidence").

■ Judgment as a matter of law is inappropriate unless there is "either an utter lack of evidence supporting the verdict, so that the jury's findings could only have resulted from pure guesswork, or the evidence [is] 'so overwhelming that reasonable and fair-minded persons could only have reached the opposite result.'" *Doctor's Assocs., Inc. v. Weible,* 92 F.3d 108, 111–12 (2d Cir.1996) (quoting *Baskin v. Hawley,* 807 F.2d 1120, 1129 (2d Cir. 1986)), *cert. denied,* 519 U.S. 1091, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997)). Under the Seventh Amendment, the jury is suzerain.

### D. Negligence

■ To prevail on a negligence claim, a plaintiff must establish the following elements under New York law: (1) that the defendant owed him or her a duty of care, (2) that the defendant breached this duty by engaging in conduct posing an unreasonable risk of harm and (3) that defendant's breach proximately resulted in damage to the plaintiff. *See, e.g., Akins v. Glens Falls City Sch. Dist.,* 53 N.Y.2d 325, 333, 424 N.E.2d 531, 535, 441 N.Y.S.2d 644, 648 (1981)(citing W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 30, at 164–65 (5th ed.1984)); *Febesh v. Elcejay Inn Corp.,* 157 A.D.2d 102, 104, 555 N.Y.S.2d 46, 47 (1st Dep't 1990). Each element will be discussed separately.

### 1. Duty

#### a. Law

■ The definition of a duty of care by one member of society to another is determined by the court. *See, e.g., Palka v. Servicemaster Mgmt. Servs. Corp.,* 83 N.Y.2d 579, 585, 634 N.E.2d 189, 192, 611 N.Y.S.2d 817, 820 (1994); *Waters v. New York City Housing Auth.,* 69 N.Y.2d 225, 229, 505 N.E.2d 922, 923, 513, N.Y.S.2d 356, 358 (1987). In the usual run of cases, a general duty to avoid negligence is assumed, and there is no need for the court to undertake detailed analysis of precedent and policy. *See Stagl v. Delta Airlines, Inc.,* 52 F.3d 463, 469 (2d Cir.1995); Restatement (Third) of Torts: General Principles § 6 (Discussion Draft April 5, 1999)(findings of no duty rare). Under established negligence principles:

> [W]henever one person is by circumstances placed in such a position with regard to another that everyone of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to the circumstances he would cause danger of injury to the person or property of the other a duty arises to use ordinary care and skill to avoid such danger.

*Havas v. Victory Paper Stock Co.,* 49 N.Y.2d 381, 386, 402 N.E.2d 1136, 1138, 426 N.Y.S.2d 233, 236 (1980) (quoting

*Heaven v. Prender,* 11 Q.B.D. 503, 509 (1883)). Where, however, a defendant's negligence inheres not in its own acts, but in its failure to anticipate the tortious or criminal acts of others, judicial consideration of the existence of a duty is warranted. *See* Restatement (Third) of Torts: General Principles § 6 cmts. c, d (Discussion Draft April 5, 1999).

■ Under New York law, "the boundaries of duty are not simply contracted or expanded by the notion of foreseeability." *Palka v. Servicemaster Mgmt. Servs. Corp.,* 83 N.Y.2d 579, 586, 634 N.E.2d 189, 193, 611 N.Y.S.2d 817, 821 (1994); *see also Strauss v. Belle Realty Co.,* 65 N.Y.2d 399, 402, 482 N.E.2d 34, 36, 492 N.Y.S.2d 555, 557 (1985); *Pulka v. Edelman,* 40 N.Y.2d 781, 785, 358 N.E.2d 1019, 1022, 390 N.Y.S.2d 393, 396 (1976). They are determined in a given case by reference to a variety of factors including reasonableness in the light of public risk-shifting policies in a modern economy. *See Palka,* 83 N.Y.2d at 586, 634 N.E.2d at 193, 611 N.Y.S.2d at 821 (factors to be balanced include "reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability").

The New York Court of Appeals has repeatedly emphasized the policy oriented nature of the duty determination. *See id.* As that court has stressed:

> While moral and logical judgments are significant components of the analysis, we are also bound to consider the larger social consequences of our decisions and to tailor our notion of duty so that "the legal consequences of wrongs [are limited] to a controllable degree."

*Waters v. New York City Housing Auth.,* 69 N.Y.2d 225, 229, 505 N.E.2d 922, 923–24, 513 N.Y.S.2d 356, 358 (1987) (quoting *Tobin v. Grossman,* 24 N.Y.2d 609, 619, 301 N.Y.S.2d 554, 249 N.E.2d 419). In *De Angelis v. Lutheran Medical Ctr.,* 58

N.Y.2d 1053, 1055, 462 N.Y.S.2d 626, 627, 449 N.E.2d 406, 407 (1983), it declared: "In fixing the bounds of … duty, not only logic and science, but policy play an important role."

The question of handgun manufacturers' duty to market and distribute their product responsibly arises at the intersection of two types of cases—those concerning liability for the acts of third parties and those concerning the duties of manufacturers under the law of negligence and strict liability. Reference to principles gleaned from both sets of cases is necessary for proper resolution of the policy issue under New York law.

i. Liability for the Acts of Third Parties

■ Generally speaking, New York courts are reluctant to impose a duty to anticipate the criminal or tortious conduct of third parties. *See, e.g., Purdy v. Public Adm'r of Westchester Cty.,* 72 N.Y.2d 1, 8, 526 N.E.2d 4, 7, 530 N.Y.S.2d 513, 516 (1988); *Pulka v. Edelman,* 40 N.Y.2d 781, 785–86, 358 N.E.2d 1019, 1022, 390 N.Y.S.2d 393, 396–97 (1976). This resistance grows out of concerns of two types.

The first is the specter of crushing liability on prospective defendants that may destroy their ability to deliver socially useful services. *See, e.g., Eiseman v. State of New York,* 70 N.Y.2d 175, 188, 511 N.E.2d 1128, 1135, 518 N.Y.S.2d 608, 614 (1987) (declining to extend prison physician's duty to accurately relate prisoner's medical history to individual members of college community out of concern that physician "not be held to limitless liability to an indeterminate class of persons conceivably injured by any negligence in that act"); *Waters,* 69 N.Y.2d at 230, 505 N.E.2d at 924, 513 N.Y.S.2d at 359 (1987) (virtually limitless liability a significant factor in court's refusal to impose duty on city housing project to protect passerby from criminal acts of third parties); *Einhorn v. Seeley,* 136 A.D.2d 122, 127, 525 N.Y.S.2d 212, 216 (1st Dep't 1988) (holding locksmith who installed allegedly defective lock re-

sponsible for rape of tenant's guest by intruder "would be to enlarge the obligations of such artisans far beyond the existing law and far beyond sound public policy").

The second is the unfairness of imposing a duty on someone who, as a practical matter, could have done little to prevent the harm which occurred. *See, e.g., Pulka,* 40 N.Y.2d at 785, 358 N.E.2d at 1022, 390 N.Y.S.2d at 396 (unreasonable to impose responsibility for negligent conduct of another "where the realities of everyday experience show us that, regardless of the measures taken, there is little expectation that the one made responsible could prevent the negligent conduct"); *Purdy,* 72 N.Y.2d 1, 8–9, 526 N.E.2d 4, 7 530 N.Y.S.2d 513, 516 (1988) (declining to impose duty of notification by doctor that patient might black out while driving).

New York courts have, however, recognized a duty predicated on the danger of a third person's tortious or criminal misconduct where a relationship between the defendant and either the plaintiff or the third party wrongdoer provides the defendant with the ability to minimize the risk. Thus, courts have held that the existence of a protective relationship—such as that between a carrier and its passenger, or a tavern owner and its patron—obligates the defendant to take reasonable steps to protect from foreseeable risks including the criminal conduct of others. *See, e.g., Nallan v. Helmsley–Spear, Inc.,* 50 N.Y.2d 507, 518–19, 407 N.E.2d 451, 457–58, 429 N.Y.S.2d 606, 613 (1980) (owner and manager of building in which plaintiff was shot owed duty to those who ventured on premises to take reasonable steps to minimize foreseeable danger to them); *Stevens v. Kirby,* 86 A.D.2d 391, 394, 450 N.Y.S.2d 607, 610 (4th Dep't 1982) (tavern owner owed duty to patrons to protect them from personal attack "when he has reasonable cause to anticipate conduct on the part of third persons which is likely to endanger their safety"). Relationships between a defendant and a third party—such as that

of parent-child or employer-employee— may require the defendant to control the third party's behavior for the protection of the plaintiff. *See, e.g., Giangrasso v. Ass'n for Help of Retarded Children,* 243 A.D.2d 680, 664 N.Y.S.2d 569 (2d Dep't 1997) (negligent hiring and retention of employee); *Chow v. Boonyam,* 240 A.D.2d 737, 660 N.Y.S.2d 729 (2d Dep't 1997) (reinstating claim against parents who allegedly entrusted their son with a hammer and knife used to kill plaintiffs' child).

Neither the inability of defendants to prevent the plaintiffs' injuries nor the potential for crushing liability is critical in the instant cases. It cannot be said, as a matter of law, that reasonable steps could not have been taken by handgun manufacturers to reduce the risk of their products' being sold to persons likely to misuse them—a point which is underscored by the jury's findings on causation. Defendants' ongoing close relationship with downstream distributors and retailers putting new guns into consumers' hands provided them with appreciable control over the ultimate use of their products. Even if they could not control what the first "consumer" would do with the gun or whether it would fall into the hands of a person other than the new gun owner, they could reduce the risk of criminal misuse by ensuring that the first sale was by a responsible merchant to a responsible buyer.

Neither would the recognition of a duty necessarily subject the handgun industry to crushing liability. Unlike the imposition of strict products liability, which would hold manufacturers liable for all handgun-related injuries regardless of individual defendants' level of care, under a negligence regime, manufacturers can avoid liability by marketing and distributing their product responsibly. Even if some negative impact on costs and price may follow restrictions on merchandising, it is not inappropriate for the price of handguns to be more reflective of their true economic cost to the community in the way of avoidable injuries and deaths. While the manufac-

ture of handguns is useful, its value to society is arguably not on the same scale as the provision of public housing, *see, e.g., Waters,* medical care, *see, e.g., Eiseman,* and secure locks, *see, e.g., Einhorn.*

Unpersuasive is defendants' contention that the absence of a "special relationship" between themselves and the plaintiffs relieved them of any duty to anticipate the conduct of the shooters in these cases. Two types of relationships giving rise to liability for the acts of third parties under New York law exist here.

First, the special ability to detect and guard against the risks associated with their products warrants placing all manufacturers, including these defendants, in a protective relationship with those foreseeably and potentially put in harm's way by their products. *See, e.g., Moning v. Alfono,* 400 Mich. 425, 254 N.W.2d 759, 765 (1977) ("It is well established that placing a product on the market creates the requisite relationship between a manufacturer, wholesaler and retailer and persons affected by use of the product giving rise to a legal obligation or duty to the persons so affected." (citing *MacPherson v. Buick Motor Co.,* 217 N.Y. 382, 111 N.E. 1050 (1916))); *cf.* John C.P. Goldberg and Benjamin C. Zipursky, *The Moral of MacPherson,* 146 U. Pa. L.Rev. 1733, 1823 (1998) ("The logic of *MacPherson* might well imply the existence of a duty to ... bystander[s]" foreseeably injured by a manufacturer's negligence, "[b]ut this would be because certain bystanders fall within a class of persons to whom vigilance of life and limb is a duty, which duty was breached"). Particularly where the product is lethal, and its criminal misuse is not only foreseeable, but highly likely to occur and to result in death or devastation, the existence of such a protective relationship may be deemed to exist. *See, e.g.,* Timothy D. Lytton, *Halberstam v. Daniel and the Uncertain Future of Negligent Marketing Claims Against Firearms Manufacturers,* 64 Brook. L.Rev. 681, 703 (1998); H. Todd Iveson, *Manufacturers'*

*Liability to Victims of Handgun Crime: A Common Law Approach,* 51 Fordham L.Rev. 771, 783–84 (1983) ("[B]ecause of the inherent dangerousness of handguns, the manufacturer has a special responsibility to guard against risks that may result from a failure to fulfill this common-law duty."). The appropriateness of the imposition of a duty in such circumstances is best expressed by the "now familiar axiom that '[t]he risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation.'" *Palka v. Servicemaster Mgmt. Servs. Corp.,* 83 N.Y.2d at 585, 634 N.E.2d at 192, 611 N.Y.S.2d at 820 (quoting *Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 344, 162 N.E. 99 (1928) (Cardozo, C.J.)).

Second, a duty is created by virtue of a manufacturer's relationship with downstream distributors and retailers, giving it "sufficient authority and ability to control," the latter's conduct for the protection of prospective victims. *Purdy,* 72 N.Y.2d 1, 8, 526 N.E.2d 4, 7, 530 N.Y.S.2d 513, 516 (1988). Such a duty is analogous to that owed to persons foreseeably endangered by the negligent entrustment of a chattel. *See, e.g., Earsing v. Nelson,* 212 A.D.2d 66, 629 N.Y.S.2d 563 (4th Dep't 1995) (plaintiff injured by BB gun stated negligent entrustment claim against seller of gun to plaintiff's thirteen-year-old playmate); Restatement (Second) of Torts § 390 (1965); Karen L. Ellmore, *Negligent Entrustment of Motor Vehicle to Unlicensed Driver,* 55 A.L.R.4th 1100, 1987 WL 419552 (1987). Like a retailer who provides goods to one with a "propensity to use [them] in an improper or dangerous fashion," *Earsing,* 212 A.D.2d at 70, 629 N.Y.S.2d at 565, a manufacturer who does business with a distributor it knows is likely to dispose of handguns in such a manner as to pose an unreasonable risk of harm to the public may be regarded as having "negligently entrusted" its products. *See* H. Todd Iveson, Note, *Manufacturers' Liability to Victims of Handgun Crime: A Common–Law Approach,* 51 Fordham L.Rev. 771,

787 (1983). Placing restrictions on sales by cutting off distributors who sell disproportionate numbers of crime guns or who sell through dubious channels is possible and may be found by a jury to be appropriate. *See* Part IV.D.2, *infra.*

A third basis for finding duty may be found in the concept described by Professor Rabin as "enhancement of risk." Robert L. Rabin, *Enabling Torts,* 49 DePaul L.Rev. (1999) (forthcoming). Professor Rabin characterizes plaintiffs' negligent marketing claim as an example of an "enabling tort" in which liability is predicated on defendants' affirmative enhancement of risk. *Id.*

### ii. Duties of Manufacturers

■ The law of New York State imposes broad duties of care on manufacturers. Under parallel principles of strict products liability and negligence law, manufacturers owe a duty to design, produce and market non-defective products which are reasonably safe for their foreseeable use and are accompanied by warnings commensurate with the degree of reasonably foreseeable risk they present. *See, e.g., Liriano v. Hobart Corp.,* 92 N.Y.2d 232, 237, 700 N.E.2d 303, 305, 677 N.Y.S.2d 764, 766 (1998); *Voss v. Black & Decker Mfg. Co.,* 59 N.Y.2d 102, 106–07, 450 N.E.2d 204, 207, 463 N.Y.S.2d 398, 401 (1983).

The roots of this broad New York duty placed on manufacturers may be traced to Judge Cardozo's opinion in *MacPherson v. Buick Motor Co.,* 111 N.E. 1050, 217 N.Y. 382 (1916). There the New York Court of Appeals "put aside the notion that the duty to safeguard life and limb, when the consequences of negligence may be foreseen, grows out of contract and nothing else." *Id.* 111 N.E. at 1053, 217 N.Y. at 390. New York tort law has since progressively expanded the obligation owed by manufacturers to those foreseeably harmed by their products. *See, e.g., Codling v. Paglia,* 32 N.Y.2d 330, 332, 298 N.E.2d 622, 624, 345 N.Y.S.2d 461, 463 (1973) ("the manufacturer of a defective product may be held liable to an innocent bystander without proof of negligence, for damages sustained in consequence of the defect"); *Bolm v. Triumph Corp.,* 305 N.E.2d 769, 773, 33 N.Y.2d 151, 158, 350 N.Y.S.2d 644, 650 (1973) (imposing liability on manufacturers for design defects which enhance or aggravate injuries because "it is the manufacturer who is solely in a position to prevent injuries from latent defects"); *Micallef v. Miehle Co.,* 39 N.Y.2d 376, 348 N.E.2d 571, 384 N.Y.S.2d 115 (1976) (latent defect rule rejected "in view of the difficulties in our mechanized way of life to fully perceive the scope of danger"); *Cover v. Cohen,* 61 N.Y.2d 261, 275, 461 N.E.2d 864, 871, 473 N.Y.S.2d 378, 385 (1984) (manufacturer owes post-sale duty to warn where dangers are revealed by user operation and brought to manufacturer's attention); *Liriano,* 92 N.Y.2d at 241, 700 N.E.2d at 308, 677 N.Y.S.2d at 769 (in cases in which substantial modification defense might preclude design defect claim manufacturer could still be held liable for failure to warn).

New York courts' broad expansion of common law duties to third parties is not limited to product-related injuries. "Not uncommonly," the Court of Appeals has stated, "parties outside a contract are permitted to sue for tort damages arising out of negligently performed or omitted contractual duties." *Palka,* 83 N.Y.2d at 586, 634 N.E.2d at 193, 611 N.Y.S.2d at 821 (maintenance contractor owed duty to hospital patients, employees and visitors). As was pointed out in the recent opinion of this court in *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.,*

> The trend in modern tort law generally has been to reject the rigid and formalistic barriers which once prohibited third parties from recovering for 'indirect' injuries.

> . . . .

> In place of the rigid formalism of the past, courts have increasingly turned to more flexible and policy oriented standards to circumscribe the limits of tort

law. The result has been a liberalization of the law of standing and a substantial broadening of the classes of plaintiffs who are allowed to bring suit.

Under the modern approach, courts have allowed 'indirect' victims to recover in a wide variety of circumstances. Accountants, auditors, attorneys, surveyors, notaries, architects, weighers, termite inspectors, and telegraph companies have all been held liable for the 'indirect' injuries they caused to third parties .... Policy considerations, including notions of foreseeability, supported a finding of liability.

36 F.Supp.2d 560, 583 (E.D.N.Y.1999) (citations omitted).

Under New York negligence law, duties of manufacturers parallel in many respects those imposed by strict products liability. *See, e.g., Enright v. Eli Lilly & Co.,* 568 N.Y.S.2d 550, 555, 570 N.E.2d 198, 203, 77 N.Y.2d 377, 387 (1991) (failure to warn claim though "couched in terms of strict liability, is indistinguishable from a negligence claim"); *Lancaster Silo & Block Co. v. Northern Propane Gas Co.,* 427 N.Y.S.2d 1009, 1014, 75 A.D.2d 55, 62 (4th Dep't 1980) ("in a design defect case there is almost no difference between a prima facie case in negligence and one in strict liability"); *McCarthy v. Olin Corp.,* 119 F.3d 148, 167 n. 19 (1997) (Calabresi, J., dissenting).

■ Recovery in strict liability in New York is predicated on the existence of a defect, either in the design of the product, the manufacture of the product or the warnings provided by the manufacturer. On the ground that the proof failed to fit the case into one of these categories, courts have rejected strict liability claims against manufacturers of guns and ammunition. *See, e.g., McCarthy v. Olin Corp.,* 119 F.3d 148, 155 (2d Cir.1997)(design defect claim against manufacturer of non-defective "black talon" hollow point bullets not viable under New York law because such bullets function in accordance with their injury-enhancing design); *Hamilton v. Accu–Tek,* 935 F.Supp. 1307, 1323 (E.D.N.Y.1996) (mere act of manufacturing and selling a non-defective handgun is insufficient to establish strict liability under New York law); *DeRosa v. Remington Arms Co.,* 509 F.Supp. 762 (E.D.N.Y.1981) (a shotgun working as designed is not unreasonably dangerous for its foreseeable use). *But see* Restatement (Third) of Torts: Products Liability § 2 cmt. e (1998) (recognizing possibility that design of an extremely dangerous product of negligible social utility may be found "manifestly unreasonable").

■ Given the limitations of strict products liability law in New York, tort problems relating to non-defective hazardous products that have not been faultily designed, or fabricated, or distributed with inadequate warnings, must be analyzed under the more general, flexible provisions of classic negligence law. As the Third Restatement of Torts instructs, "negligence retains its vitality as an independent theory of recovery for a wide range of product-related, harm-causing behavior not involving defects at time of sale." Restatement (Third) of Torts § 2, comment.

■ A product in its progression from drafting board to retail sale passes through numerous phases, at any one of which liability for a manufacturer's negligence may attach. *See* W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 96, at 684 (5th ed.1984) (manufacturer's "negligence may be found over an area quite as broad as his whole activity in preparing and selling the product" including inspection, testing, advertising and "the entire process of manufacture and sale"). New York courts have recognized negligence claims in connection with each of these phases. *See, e.g., Kaufman v. Eli Lilly & Co.,* 65 N.Y.2d 449, 482 N.E.2d 63, 492 N.Y.S.2d 584 (1985)(negligent testing); *Micallef v. Miehle Co.,* 39 N.Y.2d 376, 348 N.E.2d 571, 384 N.Y.S.2d 115 (1976) (negligent design); *Babalola v. Crystal Chemicals, Inc.,* 685 N.Y.S.2d 679 (1st Dep't

1999) (negligent testing); *Bikowicz v. Sterling Drug, Inc.*, 161 A.D.2d 982, 557 N.Y.S.2d 551 (3d Dep't 1990) (negligent marketing).

While the New York Court of Appeals has not yet explicitly recognized a duty of care in connection with the marketing and distribution of a non-defective but highly dangerous product, imposition of such a duty is consistent with the expansive view of manufacturers' duties dating back to *MacPherson* and consistently reaffirmed since then, most recently in *Liriano*, 92 N.Y.2d 232, 700 N.E.2d 303, 677 N.Y.S.2d 764 (1998). In *Liriano*, the court held that the removal of a safety guard by the purchaser of a meat grinder did not insulate the manufacturer from liability for failure to warn because "it [was] neither infeasible nor onerous, in some cases, to warn of the dangers of foreseeable modifications that pose the risk of injury." *Liriano*, 92 N.Y.2d at 240, 700 N.E.2d at 307, 677 N.Y.S.2d at 768.

Where unavoidably hazardous products like handguns are distributed, it is not unfair for the law to minimize unreasonable risk of harm through the imposition of a duty on manufacturers to market and distribute responsibly. To paraphrase Judge Cardozo: "If the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently [marketed and distributed], it is then a thing of danger. Its nature gives warning of the consequences to be expected." *MacPherson v. Buick Motor Co.*, 217 N.Y. at 390, 111 N.E. at 1053.

No legal structure exists in a vacuum. Changing dangers and relationships in the real world create the need for the law continually to redefine the parameters of duty. As the present Chief Judge of the New York Court of Appeals eloquently put the matter:

> The times are different, the facts are different, the answers vary. But always the court's function is the same, that of weighing and balancing the relation of the parties, the nature of the risk and the public interest, and then setting the outer limits of one person's duty of care to another . . . .

Judith S. Kaye, *The Human Dimension in Appellate Judging: A Brief Reflection on a Timeless Concern*, 73 Cornell L.Rev. 1004, 1011 (1988).

### b. Application

■ The precise duty alleged in this case is that of handgun manufacturers to exercise reasonable care in marketing and distributing their products so as to guard against the risk of its criminal misuse. That concept has not previously been addressed by the New York Court of Appeals, or so far as research to date has revealed, by any of New York's courts.

Prior negligent marketing cases have sought to impose liability on individual manufacturers for the marketing of a dangerous product, rather than for the nature of the marketing technique. *See, e.g., Forni v. Ferguson*, 232 A.D.2d 176, 648 N.Y.S.2d 73 (1st Dep't 1996) (semiautomatic handgun); *McCarthy v. Olin Corp.*, 119 F.3d 148 (2d Cir.1997) (hollow point bullets); *Bikowicz v. Sterling Drug, Inc.*, 557 N.Y.S.2d 551, 161 A.D.2d 982 (3d Dep't 1990) (prescription drug Talwin); *Ezagui v. Dow Chem. Corp.*, 598 F.2d 727, 736 (2d Cir.1979) (prescription drug Quadrigen). In *Forni v. Ferguson*, 232 A.D.2d 176, 648 N.Y.S.2d 73 (1st Dep't 1996), a suit by survivors and relatives of victims of a shooting spree on the Long Island Railroad against the maker of the semiautomatic handgun used by the shooter, the plaintiffs claimed that defendant Sturm Ruger & Co.'s decision to manufacture the gun for sale to civilians had been negligent. The court held that "New York does not impose a duty upon a manufacturer to *refrain from* the lawful distribution of a non-defective product." *Id.* (emphasis added). A similar suit was brought against the manufacturer of the lethal hollow-point "black talon" bullets employed in the attack. *See McCarthy v. Olin Corp.*, 119 F.3d 148 (2d Cir.1997). Again, plain-

tiffs claimed that the decision to market these bullets to the general public had been negligent. The court of appeals for the Second Circuit held that "New York courts do not impose a legal duty on manufacturers to *control the distribution* of potentially dangerous products such as ammunition." 119 F.3d at 157 (emphasis added). As was pointed out in an earlier decision in the instant case, the negligent marketing theory espoused by the *Forni* and *McCarthy* plaintiffs was essentially an alternative pleading of their strict products liability claim. *See Hamilton v. Accu–Tek*, 935 F.Supp. 1307, 1323 (E.D.N.Y.1996).

The *McCarthy* decisions laid down the rule that selling a dangerous product was not itself unlawful. This had long been recognized in such cases as *DeRosa v. Remington Arms Co.*, 509 F.Supp. 762 (E.D.N.Y.1981), in which this court recognized that a shotgun had to be dangerous in order to do its designed job. There is a more subtle but distinctively different claim in the present case—i.e., that while sale of the weapon is not itself tortious, the method of sale and distribution by producers may be.

The duty sought to be imposed by the plaintiffs here is circumscribed. It is the duty of manufacturers of a uniquely hazardous product, designed to kill and wound human beings, to take reasonable steps available at the point of their sale to primary distributors to reduce the possibility that these instruments will fall into the hands of those likely to misuse them. Such a limited duty is consistent with manufacturers' traditional broad duties under New York law. Relevant policy considerations also favor the imposition of a duty in the instant cases.

The risks associated with easy access to handguns are well known. The litany of statistics is by now familiar. *See, e.g., Hamilton v. ACCU-TEK*, 935 F.Supp. 1307, 1313–14 (E.D.N.Y.1996) (summarizing the extensive supporting data and listing sources). *But see* John R. Lott, Jr.,

*More Guns Less Crime: Understanding Crime and Gun Control Laws* (1998) (arguing that gun ownership has a deterrent effect on violent crime), *criticized in* John Carpenter, "*'More Guns, Less Crime'* Theory Hit: Research of Much-hyped Book Called Questionable," Chicago Sun-Times, July 11, 1998, at 4.

The years leading up to the period in which the shootings in this case took place saw a dramatic increase in homicides in general, and handgun killings in particular. *See, e.g.,* Franklin E. Zimring, *American Youth Violence* 35 (1998) (sharp escalation in homicides between 1985 and 1993 almost entirely attributable to gun homicides). Increases in the number of gunshot wounds per shooting victim, and the likelihood of a shooting victim's death from gunshot wounds during this period, have also been observed. *See* Garren Wintemute, M.D., *The Relationship Between Firearm Design and Firearm Violence*, 275 JAMA 1749 (1996) (linking increases in number of bullet wounds per victim and probability of victim's death to new generations of semiautomatic handguns introduced during the 1980s); Fox Butterfield, *To Rejuvenate Gun Sales, Critics Say, Industry Started Making More Powerful Pistols*, N.Y. Times, Feb. 14, 1999, at 16. According to Department of Justice statistics, the number of homicides by eighteen to twenty-four year-olds almost doubled between 1985 and 1993, and the homicide offending rate of fourteen to seventeen year-olds exploded during the same period. *See* U.S. Department of Justice, Homicide Trends in the U.S.: Age <http://www.ojb.usdoj.gov/bjs/homicide/teens.htm# vage> (visited March 17, 1999). Notwithstanding the current decline in homicides the rate of gun killings among young people remains unacceptably high.

Guns used in crime are increasingly being linked to federal firearms licensees ("FFLs"). Recent federal law enforcement review of illegal gun trafficking investigations conducted in twenty-seven cit-

ies between 1996 and 1998 reveals that 51% of guns used in crimes by juveniles and persons between the ages of 18 and 24 during that period were acquired from FFLs by intermediaries acting on their behalf. *See* Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, *The Youth Crime Gun Interdiction Initiative—Performance Report* at 13; *see also* Fox Butterfield, *New Data Point Blame at Gun Makers: Fewer Criminals Stole Their Weapons Than Thought, Analysts Say,* N.Y. Times, Nov. 28, 1998, at A8. According to analysis of 1998 crime gun traces from these twenty-seven cities, up to one-third of guns used in crimes by juveniles and one-half of those used by persons between ages 18 and 24 were purchased from an FFL within three years of the commission of the crime. *See* Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, *The Youth Crime Gun Interdiction Initiative—Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Markets in 27 Communities* at 12. Such a rapid rate of diversion from the legitimate retail market, or "time-to-crime" rate, is indicative of substantial firearms trafficking. *Id.* at 8. Time-to-crime rates are shorter for semiautomatic pistols than for revolvers. *See* Fox Butterfield, *Study Exposes Illegal Traffic In New Guns: Licensed Dealers Sell Many Used in Crime,* N.Y. Times, Feb. 21, 1999, at A22.

Handguns make their way into the hands of youths and criminals who use them to commit crimes in a variety of ways. Two popular methods used by firearms traffickers to purchase guns are first, the use of "straw purchasers,"—stand-in purchasers who obtain firearms in lawful transactions, and then give or sell them to persons who are not legally entitled to have them—and, second, the falsification of ATF Firearm Transaction Records at the time of purchase. *See,* Joseph P. Greco, *Pattern Crimes: Firearms Trafficking Enforcement,* F.B.I Law Enforcement Bulletin, Sept. 1998, at 7.

Data like these tend to confirm the existence of a thriving illicit trade in handguns. They are properly considered by the courts in determining whether to impose a duty on manufacturers, who—the courts could conclude—may be well positioned to play a significant role in reducing the flow of illegal guns. The means available include declining to do business with careless or unscrupulous FFLs, limiting sales at unregulated gun shows, and requiring that first sales of handguns to the public take place only in fully stocked, responsibly operated stores.

Recognition of a duty on the part of handgun manufacturers in connection with the marketing and distribution of their products would not be unfair—in light of the serious consequences of a failure to do so—or inefficient. Manufacturers who market and distribute handguns negligently set the stage for their criminal misuse. They place at risk innocent persons who derive no gain from easy access to these products. Unlike users and consumers of handguns, injured bystanders exercise no control over their exposure to risk. They have almost no opportunity to choose either to encounter handguns or to avoid contact with them.

To the extent manufacturers' negligent marketing or distribution practices allow them to profit from the acquisition of handguns by those likely to misuse them, they must be deemed to have benefitted wrongfully at the expense of those injured or killed. Fairness mandates restoration of the balance through the imposition of a duty to market and distribute handguns responsibly. *See* Ernest J. Weinrib, *Corrective Justice* 77 Iowa L.Rev. 403, 409 (1992) ("[C]orrective justice requires the actor to restore to the victim the amount representing the actor's self-enrichment at the victim's expense."); Kathryn R. Heidt, *Corrective Justice from Aristotle to Second Order Liability: Who Should Pay When the Culpable Cannot?,* 47 Wash. & Lee L.Rev. 347, 362 (1990) ("When one receives gains as a result of the wrongful

act of a third party, an act that also causes an innocent party a loss, the gains are arguably 'unfair,' because the gainer is getting more than its share. Even a mechanical application of corrective justice requires that such gains be used to compensate the victims."). The likelihood of harm and the high probability that victims will be unable to recover from the actual shooters further support a duty on the part of manufacturers.

Prescribing an obligation to market and distribute handguns responsibly fulfills the exercise of the "court's responsibility to define an orbit of duty that places controllable limits on liability." *Strauss v. Belle Realty Co.*, 65 N.Y.2d 399, 405, 482 N.E.2d 34, 38, 492 N.Y.S.2d 555, 559 (1985). In the instant litigation, the jury deliberated and acted with great discrimination. It found that only fifteen of the twenty-five manufacturers sued had behaved negligently. The court must ignore the post hoc statements of individual jurors describing their deliberations, as both unreliable and impermissible under Rule 606(b) of the Federal Rules of Evidence. *United States v. Gigante*, 53 F.Supp.2d 274 (E.D.N.Y. 1999).

As the evidence and this precise verdict demonstrate, marketing and distribution practices among manufacturers differ sufficiently to enable a jury to identify and exonerate those who exercise due care. To the extent manufacturers choose to structure their affairs in a way which, though technically legal, exposes them to tort liability, they can spread the risk of loss by raising prices to more accurately reflect the true costs of negligently marketing and distributing handguns. Alternatively, they can adopt non-negligent methods of distribution described by the expert evidence as economically feasible.

Imposition of a duty to exercise care in the marketing and distribution of handguns will maximize safety. As between a negligent handgun manufacturer and an injured bystander, the former must be regarded as the "cheapest cost avoider,"— the party upon whom imposition of liability will lead to the greatest degree of safety and efficiency. *See generally* Guido Calabresi, *The Costs of Accidents: A Legal and Economic Analysis* (1970). Holding defendants liable when injuries result from their failure to exercise due care is likely to encourage more prudent manufacturing and distribution practices. This potential deterrent effect is of particular importance, where, as here, the legitimate market is saturated. *See* Tom Diaz, *Unsafe at Any Caliber*, N.Y.L.J., May 13, 1999, at 3 ("The firearms industry is fighting desperately against a saturated market and stagnant sales."); *cf.* Paul M. Barrett & Vanessa O'Connell, *How a Gun Company Tries to Propel Itself Into the Computer Age: Colt's 'Safety' Chip Bonds a Firearm and its User: That Scares the Industry*, Wall St. J., May 12, 1999, at A1 ("Colt's pursuit of the ambitious smart gun project ... turned the company into a pariah within its industry and made it the target of a boycott last year that cost Colt's millions in sales."). The tort law can properly impose a strong incentive on manufacturers to reduce the risk of injury by marketing and distributing their products responsibly.

In sum, the strong legal and policy arguments in favor of liability and the fact that similar practical considerations have motivated New York's highest court in the past to recognize the responsibility of manufacturers for product-related injuries, support the prediction that the New York Court of Appeals would recognize a duty on the part of defendants to use due care in marketing and distributing their inherently dangerous product.

### 2. Breach

#### a. Law

A defendant is negligent when it breaches its duty of care by engaging in conduct, posing an unreasonable risk of harm to others. The primary factors to be taken into account in assessing the reasonableness of a defendant's conduct are,

the foreseeable likelihood that it will result in harm, the foreseeable severity of the harm that may ensue and the burden that would be borne by the actor and others if the actor takes precautions that eliminate or reduce the possibility of harm.

Restatement (Third) of Torts: General Principles § 4 (Discussion Draft April 5, 1999); *see also United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947) (Hand, J.) (risk posed is unreasonable if the social utility of conduct creating it is outweighed by the likelihood and degree of harm).

A defendant's conduct may pose an unreasonable risk of harm to others when combined with the negligent or criminal acts of third persons. *See* Restatement (Second) of Torts §§ 302A–B (1965); Restatement (Third) of Torts: General Principles § 17 (Discussion Draft April 5, 1999) ("The conduct of a defendant can lack reasonable care insofar as it can foreseeably combine with or bring about the improper conduct of . . . a third party.").

■ Failure to anticipate and guard against third party misconduct constitutes negligence in a variety of contexts. *See, e.g., Kush v. City of Buffalo*, 59 N.Y.2d 26, 449 N.E.2d 725, 462 N.Y.S.2d 831 (1983) (Board of Education was negligent in leaving student employees unsupervised in building and failing to secure dangerous chemicals); *Nallan v. Helmsley–Spear, Inc.*, 50 N.Y.2d 507, 519–20, 407 N.E.2d 451, 458, 429 N.Y.S.2d 606, 613–14 (1980) (evidence of history of crimes in building sufficient to support conclusion that defendants breached duty to anticipate risk of criminal activity and take reasonable precautionary steps to reduce it).

■ Where differing inferences may be drawn from the evidence of negligence, the defendant's breach is a question of fact to be determined by the jury. *See Stepanian v. Rozanski*, 195 A.D.2d 973, 974, 600 N.Y.S.2d 599, 600 (4th Dep't 1993) (citing *Eddy v. Syracuse Univ.*, 78 A.D.2d 989,

433 N.Y.S.2d 923 (4th Dep't 1980)); Restatement (Second) of Torts § 328(C) (1965); *see also, e.g., Rotz v. City of New York*, 143 A.D.2d 301, 305, 532 N.Y.S.2d 245, 248 (1st Dep't 1988) (concert producer's negligence in gathering together extremely large crowd to hear a free outdoor concert and then failing to institute adequate crowd control measures was question for jury); *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463 (2d Cir.1995) (airline's negligence in failing to provide reasonably safe passenger baggage retrieval system was a jury question). The highly fact-specific determination of negligence is ideally suited to jury resolution. As the New York Court of Appeals has explained, this is "not only because of the idiosyncratic nature of most tort cases . . . but, perhaps above all, because in the determination of issues revolving about the reasonableness of conduct, the values inherent in the jury system are rightfully believed an important instrument in the adjudicative process . . . ." *Havas v. Victory Paper Stock Co.*, 402 N.E.2d 1136, 49 N.Y.2d 381, 388, 426 N.Y.S.2d 233, 237 (1980); *see also* W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 37, at 237 (5th ed. 1984) ("Under our system of procedure, this question [of breach] is to be determined in all doubtful cases by the jury, because the public insists that its conduct be judged in part by the man in the street rather than by lawyers, and the jury serves as a shock-absorber to cushion the impact of the law.").

As the court of appeals for the Second Circuit has recently recognized, New York courts have followed the general trend rejecting judicially-imposed standards of conduct designed to limit liability in favor of a larger role for juries. *See Liriano v. Hobart Corp.*, 170 F.3d 264, 268 (2d Cir. 1999). It noted: "[t]he courts of New York have several times . . . ruled that judges should be very wary of taking the issue of liability away from juries, even in situations where the relevant dangers might seem obvious, and especially when

the cases in question turn on particularized facts." *Id.*

■ A manufacturer's conduct must be assessed according to the standard of a reasonably prudent entity in light of all the circumstances. A manufacturer who "is one of a limited number of parties that engage in an activity that poses distinctive and significant dangers .... has a ·clear obligation to acquire special knowledge and special skills that relate to that dangerous activity." Restatement (Third) of Torts: General Principles § 10 cmt. a (Discussion Draft April 5, 1999). This specialized knowledge may be considered in appraising the reasonableness of a manufacturer's behavior. *See id.* at § 10.

Technical compliance with all relevant laws and regulations is not dispositive. *See, e.g., Jemmott v. Rockwell Mfg. Co.,* 216 A.D.2d 444, 444–45, 628 N.Y.S.2d 184, 185 (2d Dep't 1995); *Feiner v. Calvin Klein, Ltd.* 157 A.D.2d 501, 549 N.Y.S.2d 692, 693 (1st Dep't 1990). The exercise of due care mandates additional preventive measures where a reasonably prudent person would have taken them. *See* Restatement (Second) of Torts § 288(C) (1965); Restatement (Third) of Torts: General Principles § 14(a) (Discussion Draft April 5, 1999).

### b. Application

■ The issue is whether, drawing all reasonable inferences in the plaintiffs' favor, the evidence presented at trial was sufficient to support the jury's conclusion that the three defendants found liable for injuries to Mr. Fox (the Fox defendants) marketed or distributed their handguns negligently. Proof of the sales history of the specific gun used in the Fox shooting is not required. Plaintiffs need only produce evidence from which a fair-minded jury could conclude that the Fox defendants failed to market and distribute their product—a .25 caliber handgun—reasonably in light of all the circumstances. They have met that burden.

The risks associated with easy access to handguns have already been demonstrated. *See* Part IV.D.1.b, *supra.* The alarming rate of death and injury from handgun violence was headline news nationwide during the years leading up to the shootings and should have been obvious to defendants. *See, e.g.,* Tracy Thompson, *Gunplay Blights Childhood in D.C.: Plague of Shootings Leaves Hundreds of Young Victims,* Wash. Post, Sept. 14, 1992, at A1; *A Strong Stand Against Guns: Violence in America Has Created a Health Emergency, Magazine Says,* Kansas City Star, June 10, 1992, at A1; Kevin Diaz, *Armed and Dangerous at 16: More Kids Are Carrying, Using Firearms,* Star Tribune (Minneapolis), December 11, 1991, at A1; *Handguns Used to Kill Thousands Each Year,* St. Petersburg Times, March 29, 1991, at 2A; Sari Horowitz, *Youth and Violence Increasingly Linked;* Police Blame Lure of Guns, Drugs for Recent Incidents, Wash. Post, Jan. 28, 1988, at A1. The jury could reasonably infer that defendants, as informed members of the community, were aware of these killings as well as of the illegal market for their product necessarily implied by widespread handgun use by juveniles and felons. *See* Restatement (Second) of Torts § 290 (1965) ("In general, the actor is required to know everything with respect to the risk of harm which is a matter of common knowledge in the community in which his conduct occurs."). ·

There was ample evidence presented at trial to persuade a rational jury of both the widespread movement of .25 caliber handguns into the underground market from legitimate retail sources and defendants' awareness of this situation. Plaintiffs' experts testified extensively as to the ways in which new guns make their way into the underground market. They testified to "convenience trafficking" (movement of guns between states for profit), "straw purchases" (purchases in which the buyer of the gun is a stand-in for someone not legally entitled to buy one, for example an underage buyer or a convicted felon), cor-

rupt practices by FFLs, and stolen guns. Tr. 403; 405–08; 734–35; 738. With regard to stolen guns, Joseph J. Vince, until recently chief of the Crime Gun Analysis Branch of the Bureau of Alcohol, Tobacco and Firearms, testified that:

In the studies that we performed both with us and with various academics in major universities in the United States, we have found that the majority of crime guns are not stolen firearms, crime guns being illegally trafficked to criminals.

Tr. 1027.

Mr. Vince, also testified that "[i]n the research that we have done, we have not seen stolen firearms being employed by criminals. The majority of the time we are seeing them getting them from retail sources." Tr. 1044. This expert evidence introduced by plaintiffs was admissible and highly probative. See Fed.R.Evid. 401–403, 702, 703; Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

On the issue of defendants' awareness of the large scale diversion of handguns into the illegal market via retail sales, both Mr. Vince and Steve Higgins, former head of ATF, testified to ATF's efforts to educate firearms dealers about the problem of illegal acquisition of guns by "straw purchasers." Tr. 1623–1625, 736–38. According to Mr. Higgins, ATF newsletters were sent on several occasions to manufacturers and others describing the problem and informing recipients of how to detect straw purchasers.

A 1994 promotional pamphlet issued by the Sporting Arms and Ammunition Manufacturers Institute ("SAAMI"), an industry trade association to which the manufacturers of most of the handguns produced in the United States belong, was in evidence. Tr. 916. It was the subject of extensive oral testimony. Its contents supported an inference of industry awareness of an illicit handgun market traceable in significant part to retail sources unsupervised and uncontrolled by their suppliers, the manufacturers, and their agents, the distributors. The pamphlet, entitled, "A Responsible Approach to Public Firearms Ownership and Use" explicitly refers to "the illegal trade in firearms." Tr. 933. It notes membership support for "measures designed to keep firearms out of the hands of criminals and other individuals who could not be considered as responsible firearms owners," Tr. 932, including "severe penalties for firearms dealers who knowingly sell to unqualified individuals or who knowingly participate in 'straw man' transactions." Tr. 934.

The jury could also have credited the extensive documentary and oral evidence presented with regard to the flow of guns—particularly from the states of the southeast, where, experts testified, it is relatively easy to purchase a gun, to the states of the northeast, where it is relatively difficult to obtain one—and the high proportion of New York crime guns traceable to out-of-state sources. Mr. Vince testified to a pattern of gun traffic, as revealed by a 1997 ATF report, from southeastern "source" areas into the New York City "market" area:

[I]n New York, you have a lot of firearms that come from these southeast areas simply because they are abundant down there, they are more easily [sic] to acquire, and they are cheaper. You can bring them to New York City and make a profit. That is what this is all about. That's what criminals are trying to do, is make profits on this.

Tr. 1031.

Plaintiffs' expert biostatistician, Dr. Howard Andrews, a research scientist and professor at Columbia University's School of Public Health, also testified at length on this topic. Based on his analysis of the ATF trace database, he concluded that between 1993 and 1996, approximately 43% of New York crime guns came from the southeast, and that, all told, 85–90% of such guns came from out of state. Tr. 1834–40.

He testified that this was consistent with studies dating back twenty years:

> Even at that time it was clear and very clearly documented in random samples of recovered guns that a very low percentage of guns used in crimes committed in New York come from New York, that most of them come from elsewhere.... [T]his history goes back a long way, the history of this consistent finding.

Tr. 1851. The jury could reasonably have imputed to defendants, as both members of the public and specialists in guns, knowledge of such a well established pattern. The deposition testimony of Robert Hass, a Smith & Wesson executive for eleven years, was read into the trial record. He testified: "I would be hard put to say when was the first time I heard [of the flow of guns from the southeast to the northeast]. I read the—I read the newspapers and I watch television. It's mentioned frequently." Tr. 2321–22.

The jury could reasonably have concluded that in considering all the circumstances—industry knowledge of widespread trafficking in new handguns, heavy movement of guns from "weak law" to "strong law" states, and risks associated with criminals' easy access to these dangerous instruments—defendants were negligent in failing to take appropriate steps to reduce the risk of their products' being sold to persons with a propensity to misuse them. Steps recommended by witnesses included (1) requiring distributors to sell only to stocking gun dealers, i.e., retailers who stock guns for sale from legitimate retail outlets, (2) prohibiting sales at gun shows, where widespread unrecorded and unsupervised sales to nonresponsible persons were said to take place, and (3) analyzing trace requests to locate retailers who disproportionately serve as crime gun sources, and cutting off distributors who do business with them.

Comprehensive testimony on this issue was offered through plaintiffs' marketing expert, Dr. David Stewart, Chairman of the Marketing Department at the University of Southern California. Dr. Stewart testified to industry-wide initiatives by manufacturers of products which, like handguns, pose a high risk of harm through misuse or criminal activity. Joint industry-initiated agreement on standards aimed at reducing product-related risks are characteristic of makers of such products as all terrain vehicles ("ATV's"), paints and coatings, and chemicals, Dr. Stewart testified. For example, according to Dr. Stewart, makers of ATV's voluntarily set age thresholds for sales of certain of their products. Tr. 1285. The National Paint and Coatings Association has promulgated detailed standards regarding distribution of its products; retailers who sell spray paint are required to keep this product locked up and to refrain from selling it to minors, in order to avoid graffiti. Tr. 1285–86. Makers of fertilizers and herbicides restrict distribution in order to ensure that these potentially highly hazardous products are sold by qualified, well-trained personnel who can instruct the purchaser as to their proper use. Tr. 1286–87.

Based on his analysis of these self-regulating industries and of the marketing and distribution practices of the gun industry, Dr. Stewart generated a list of steps handgun manufacturers could feasibly take to reduce the risks associated with their products, including franchising retail outlets, restricting distribution to qualified retail stores, and termination of the distribution agreements of those distributors who sell handguns irresponsibly. Tr. 1296–1300. This series of measures was largely aimed at ensuring greater control over retail sales by reducing "market coverage," i.e. the number of distribution points close to the consumer. Dr. Stewart stated that this was "a common way of preventing leakage from one market into another such as [the] legitimate market into the illegal market." Tr. 1443.

Dr. Stewart also characterized a prohibition of sales of handguns at gun shows as

"a prudent prohibition that seems to recognize at some level there is an illegal market and this is a way of reducing ... market coverage ...." Tr. 1309.

Stephen Sanetti, Vice President and General Counsel of Sturm Ruger & Co., seemingly concurred. He testified that since 1985, Sturm Ruger has permitted distributors to sell only to stocking gun dealers. Strum Ruger follows this practice, Mr. Sanetti testified, among other reasons "to promote safety, to make sure the laws are complied with." Tr. 636–37. It is significant that this company was not found negligent by the jury.

Lieutenant McCann, director of a joint New York Police Department/ATF task force formed to study illegal firearms trafficking, testified that stocking gun dealers tended not to be involved in, or to facilitate, illegal activity. Tr. 419. Steven Higgins testified that, during his tenure as director of ATF, he was particularly concerned about FFLs who did not operate a legitimate firearms business because they had a lesser stake in compliance than did dealers who stood to lose their entire business and capital along with their license in the event of any wrongdoing. Tr. 743.

Mr. Hass, the former Smith & Wesson executive, portions of whose deposition testimony were read into the trial record, admitted under oath that, in his view, gun manufacturers do not do as much as they could to reduce the risk of their products falling into dangerous hands. Specifically, Mr. Hass testified that manufacturers could feasibly rewrite their distribution contracts to allow them to cut off retailers who make multiple sales to single individuals in short periods of time or who repeatedly have crime guns traced to them, each of which, Mr. Hass testified, is

> indication of trouble. They are certainly not something that I think the industry wants to foster, even though such behavior may be strictly in compliance ... with the laws in the states where the retailer resides.

Tr. 2327. These retailers could be cut off, he noted, "[j]ust in the same way a retailer would be cut off who broke price and published ads and God knows we did that enough." Tr. 2330. According to Mr. Hass, it would be possible for manufacturers to analyze trace requests received from ATF to determine which of their downstream partners repeatedly serve as crime gun outlets. "The manufacturers," Mr. Hass testified, "could do more and their hands aren't clean if they ship totally legally to distributors. There's more that could be done." Tr. 2332.

The jury could well have credited the testimony of plaintiffs' experts as well as that of Mr. Hass and Mr. Sanetti and concluded that those manufacturers who marketed handguns to distributors without attempting to reduce their availability to persons likely to misuse them were negligent. There was clearly sufficient evidence with regard to individual manufacturers' marketing and distribution policies—in the form of distributor agreements, catalogues, advertisements, retailer applications and oral and deposition testimony of employees and officers—to enable the jury to evaluate each defendant's conduct separately, as it was instructed to do. For example, during deliberations, the jury called for all distributor agreements that had been admitted into evidence. It exonerated those manufacturers whose agreement contained a term prohibiting sale of their products to FFLs without a legitimate walk-in place of business, as suggested by the experts.

In sum, there was ample evidence presented at trial from which the jury could have concluded that defendants were aware of the risks associated with their products and of the movement of large numbers of them from southeastern to northeastern states and from the legitimate into the underground market and that, in light of these circumstances, it was appropriate to require defendants to take reasonable steps to market and distribute handguns responsibly. These conclusions

would support the jury's finding of negligence.

### 3. Causation

#### a. Law

##### i. Proximate Cause

■ The third element of a negligence claim under New York law is "proximate cause." To satisfy this element, a plaintiff must establish that defendant's negligence was a substantial foreseeable factor in bringing about his or her injury. *See, e.g., Nallan v. Helmsley–Spear, Inc.,* 50 N.Y.2d 507, 520, 429 N.Y.S.2d 606, 614, 407 N.E.2d 451, 459 (1980); *Derdiarian v. Felix Contracting Corp.,* 51 N.Y.2d 308, 315, 414 N.E.2d 666, 670, 434 N.Y.S.2d 166, 170 (1980); Restatement (Second) of Torts § 431 (1965). As used in this memorandum and in the jury charge, the term "proximate cause" includes both the concept of "actual," or "in-fact", causation and the requirement that a defendant's liability be limited to injuries which foreseeably flow from its conduct. *See* Prosser & Keeton § 30, at 165 ("legal" or "proximate" cause includes notion of "in-fact" causation).

■ The issue of proximate cause is ordinarily decided by the finder of fact, unless there is some basis for a determination by the court that the causal connection between defendant's negligence and plaintiff's injury should be deemed severed as a matter of legal policy.

The policy issues bearing on the application of a proximate cause cut-off for liability, as developed in the recent opinion of this court in *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.,* 36 F.Supp.2d 560 (E.D.N.Y.1999), bear on handguns as well as on tobacco. To paraphrase from that opinion:

> [I]t is difficult to imagine a set of circumstances which would militate more strongly in favor of a finding of proximate cause ... than the present one. If the allegations are to be believed, the defendants in this suit are responsible for [many unnecessary deaths through their careless marketing and distribution of handguns]
>
> . . . .
>
> ... [T]he defendants' alleged misconduct entails moral opprobrium of extraordinary proportions. Society has an especially compelling interest in deterring future harms of the type and magnitude alleged [and proven in this case].

*Id.* at 584–85 (E.D.N.Y.1999).

##### ii. Intervening Cause

■ Under New York law, an intervening intentional or criminal act by a third party is not automatically deemed a supervening act insulating the initial tortfeasor from liability. An intervening act breaks the chain of causation only "if it is of such an extraordinary nature or so attenuated from the defendants' conduct that responsibility for the injury should not reasonably be attributed to them." *Gordon v. Eastern Ry. Supply, Inc.,* 82 N.Y.2d 555, 562, 626 N.E.2d 912, 916, 606 N.Y.S.2d 127, 131 (1993).

Where "the intervening act is a natural and foreseeable consequence of a circumstance created by defendant, liability will subsist." *Kush v. City of Buffalo,* 59 N.Y.2d 26, 33, 449 N.E.2d 725, 729, 462 N.Y.S.2d 831, 835 (1983); *see also Nallan,* 50 N.Y.2d at 520–21, 407 N.E.2d at 459, 429 N.Y.S.2d at 614–15 (1980) (intentional shooting of plaintiff in lobby of office building with history of criminal activity was a not a supervening cause exonerating building owner and manager from liability but a significant foreseeable possibility); *Rotz v. City of New York,* 143 A.D.2d 301, 532 N.Y.S.2d 245 (1st Dep't 1988) (intervening acts of third persons who initiated stampede after Central Park concert did not insulate concert promoter from liability for plaintiff's injuries). *Cf.* Robert L. Rabin, *Enabling Torts,* 49 DePaul L.Rev. (1999) (forthcoming) (observing progressive erosion of intervening act limitation on proximate cause as exemplified in "key in the ignition," dram shop and social host cases).

██ Failure to take reasonable steps to guard against a clearly foreseeable criminal act is negligent. *See, e.g., Kush,* 59 N.Y.2d 26, 449 N.E.2d 725, 462 N.Y.S.2d 831 (intervening acts of student employees who stole chemicals from lab and stored them in bushes on school property were the sort of risk which gave rise to duty and therefore did not insulate the school from liability to 8–year old boy injured when chemicals exploded as he played with them); *Derdiarian,* 51 N.Y.2d 308, 414 N.E.2d 666, 434 N.Y.S.2d 166 (a construction company was not insulated from liability by intervening acts of negligent driver who entered work site, where risk of such an event was what rendered company's failure to safeguard site negligent). As the New York Court of Appeals has made clear, "[w]hen the intervening, intentional act of another is itself the foreseeable harm that shapes the duty imposed, the defendant who fails to guard against such conduct will not be relieved of liability when that act occurs." *Kush,* 59 N.Y.2d at 33, 449 N.E.2d at 729, 462 N.Y.S.2d at 835.

### iii. Mass Tort Causation

Plaintiffs' suit is comparable to one in a mass tort. It analogizes illegal handguns to deadly pathogens. *See Hamilton v. Accu–Tek,* 935 F.Supp. 1307, 1313 (E.D.N.Y.1996). In mass toxic tort cases, for example, determining whether the plaintiff has established cause-in-fact ordinarily necessitates a two-fold inquiry: "whether the epidemiological or other scientific evidence establishes a causal link between [exposure] and [disease], and whether plaintiff is within the class of persons to which inferences from the general causation evidence should be applied." *In re Joint Eastern & Southern Dist. Asbestos Litig.,* 52 F.3d 1124, 1131 (2d Cir.1995) (citing *In re Agent Orange Product Liability Litig.,* 611 F.Supp. 1223, 1261–62 (E.D.N.Y.1985), *aff'd,* 818 F.2d 187 (2d Cir. 1987), *cert. denied,* 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988)).

To satisfy their causation burden, toxic tort plaintiffs are generally required to demonstrate both a greater than 50 percent probability of causation and a specific causal link between their injuries and exposure to defendant's product. Proof of the latter element usually consists of medical testimony that no alternate satisfactory explanation exists for the plaintiff's disease. *See* Margaret A. Berger, *Eliminating General Causation: Notes Towards a New Theory of Justice and Toxic Torts,* 97 Colum. L.Rev. 2117, 2121–22 & n.18 (1997).

Where circumstances have made it impossible for plaintiffs to determine which one of a number of manufacturers made the particular unit of the product which caused their injury, some states have fashioned alternative theories of liability which eliminate this identification requirement. *See, e.g., Hymowitz v. Eli Lilly & Co.,* 73 N.Y.2d 487, 539 N.E.2d 1069, 541 N.Y.S.2d 941, *cert. denied,* 493 U.S. 944, 110 S.Ct. 350, 107 L.Ed.2d 338 (1989) (market share liability); *Martin v. Abbott Lab.,* 102 Wash.2d 581, 689 P.2d 368 (1984) (market share alternate liability); *Collins v. Eli Lilly & Co.,* 116 Wis.2d 166, 342 N.W.2d 37 (1983) (risk-contribution liability). Under these theories, plaintiffs prove causation by establishing by a preponderance of the evidence that exposure to a particular substance causes the disease in question, and that exposure to this product—regardless of who may have manufactured the unit involved—caused the plaintiff to develop the disease. The burden then shifts to the defendant to disprove causation. *See, e.g., Hymowitz,* 73 N.Y.2d at 512 n. 2, 539 N.E.2d at 1078, 541 N.Y.S.2d at 950 (defendant can exculpate itself by showing it never marketed DES for pregnancy purposes); *Sindell v. Abbott Lab.,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924, 937 (1980) (defendant can exculpate itself by showing it could not have made the particular item which caused the plaintiff's injuries). Liability is then apportioned according to the degree of risk

posed by individual defendants, as measured by each one's share of the relevant market. *But see Collins,* 342 N.W.2d at 49 (market share, if determinable, only a "relevant factor" to be considered in allocating damages among defendants).

In the context of DES, in which these theories were developed, there was such a strong statistical association between exposure and disease that evidence of exposure was deemed sufficient to establish a causal connection. *See* Berger, *supra* at 2121 & n. 16. Market share liability is, however, increasingly being adopted in other areas, *see* Part IV.D.4.a.i *infra,* including some in which plaintiffs' injuries may be less obviously linked to defendants' product.

While the charge on burden of proof in the instant case was requested by and favored the defendants, it could be argued that in those toxic-like cases, where "cause-in-fact" is in some doubt, some leeway on the jury's part to determine probability is warranted. This flexibility on burden of proof is clearly warranted as to damages. *See, e.g., Blue Cross & Blue Shield of New Jersey,* 36 F.Supp.2d 560, 585 (E.D.N.Y.1999). Arguably, proof of negligence and proof that negligence caused damage to some people, but not necessarily to the particular plaintiffs in the case, would warrant allocating proportional shares of damages among those who are liable defendants. *See, e.g., David Rosenberg, The Causal Connection in Mass Exposure Cases: A "Public Law" Vision of the Tort System,* 97 Harv. L.Rev. 849 (1984) (proposing that recovery be proportional to excess disease risk among those exposed rather than predicated upon establishment of a greater than fifty percent probability of causation). A relatively small amount of damages granted individual plaintiffs in such cases would reflect a jury's decision to view the law in this practical way. Whatever may be the conceptual legal arguments in favor of such an approach in the present case, plaintiffs met their burden of producing evidence sufficient to support the preponderance standard charged in the jury instructions and found by the verdict.

### b. Application

 The jury concluded that negligent marketing or distribution practices on the part of American Arms, Inc., Beretta U.S.A. Corp., and Taurus International Manufacturing, Inc. proximately caused Steven Fox's injuries and his mother's damages. Defendants found liable in the Fox case argue (1) that the record does not support the jury's findings of proximate cause, and (2) that the issue of causation should in any event never have been submitted to the jury because any causal connection between the plaintiffs' injuries and negligent conduct on the part of any defendant was broken by the intentional criminal conduct of the shooters.

Defendants' reliance on the doctrine of supervening causes is misplaced. As already demonstrated, criminal misuse of handguns by third parties was not only a reasonably foreseeable consequence of defendants' negligent marketing and distribution practices, it was the precise risk; failure to take reasonable steps to guard against it is what made defendants' conduct negligent. *See* Part IV.D.3.a.ii, *supra.*

Plaintiffs' proof was more than sufficient, with regard to both general and specific causation, to justify sending the issue of proximate cause to the jury. There was ample evidence presented that could persuade a rational jury by a preponderance of the evidence (1) that the proliferation of underground market handguns in New York causes incidents like that in which sixteen-year old Stephen Fox was shot and crippled by his fifteen-year-old friend, Alfred Adkins, and (2) that Mr. Adkins' easy access to the .25 caliber handgun he illegally possessed and used in the shooting was proximately caused by negligent marketing or distribution practices on the part of manufacturers of .25 caliber handguns.

Because market share theory applies, *see* Part IV.D.4.b, *infra*, Mr. Fox need not causally connect his shooting to the negligence of a particular manufacturer of .25 caliber handguns. A causal link between the shooting and negligent marketing and distribution practices on the part of manufacturers of the *type* of handgun used is sufficient.

Plaintiffs' evidence of general causation was presented through their expert, Dr. Jeffrey Fagan, a criminologist with over twenty years' experience in the area of interpersonal violence and its etiology. Dr. Fagan, a Professor at Columbia University's School of Public Health, lecturer at Columbia Law School, and director of the Center for Violence Research and Prevention, testified at length. He testified in detail concerning his research on both the impact of guns on the outcome of violent incidents among New York City youths and patterns of gun violence in different New York City neighborhoods.

In one study, highly structured in-depth interviews were conducted with over 400 New York males between the ages of sixteen and twenty-four. The young men were asked to recreate violent episodes from their own lives, some involving guns and others not. The interviewers, individuals who themselves had once been involved in street violence, were specially trained, Dr. Fagan explained, to enhance their ability to gauge the truthfulness of their subjects' responses. Analysis of the interviews revealed a strong correlation between the presence of guns and the violent resolution of disputes arising in a variety of contexts, ranging from robberies and fights over drugs to perceived personal slights. These results, Dr. Fagan declared, were corroborated by extensive research dating back to the 1960's. Tr. 1476. "In events where guns were present," Dr. Fagan noted,

the decisions that [the young men] made were very, very different and outcomes of the events were far more likely to involve if not lethal violence, then serious injury violence, somebody got shot . . . . When guns were not present, fights would end in lesser used forms of violence or no violence at all.

Tr. 1470–71.

Disputes over territory, status and identity, Dr. Fagan testified, are an ordinary part of adolescent development. Tr. 1473.

What made the whole process into something that spiraled out of control was the presence of guns and the availability of guns and kids to be able to use guns. If a fight developed, if somebody had a beef or dispute with another kid, the beef could be settled quickest and easiest with the least danger by using guns to attack, and that's where we saw the difference between gun fights and other fights where guns weren't present.

Tr. 1474.

Dr. Fagan attributed the increased likelihood that garden-variety adolescent disputes would escalate into bloody confrontations to what he termed the "ecology of violence," the widely held assumption among young inner city males, that every other youth with whom they came in contact was carrying a gun, and that every social encounter was thus a potentially lethal one. In such an environment, the choice to use a gun could be assumed by the youths involved to make strategic sense:

Everybody assumed that when violent events happened, when disputes happened, whether it be a fight over a girlfriend or bump in the street or an ongoing dispute between your family or somebody else's family, the way you settled that dispute was with a gun, and if you didn't show a gun or didn't use a gun, or somebody pulled a gun on you and you didn't retaliate in kind you could be marked as somebody who could be taken out could be hit and [there] developed this very vicious cultural dynamic.

Tr. 1484.

Dr. Fagan's study revealed the existence of an active street market providing virtu-

ally unfettered access to illegal firearms. Tr. 1485. Handguns could be obtained almost instantaneously.

Dr. Fagan also described the results of his statistical research on gun and non-gun homicide in different New York City neighborhoods over time. Controlling for the differing susceptibilities of these neighborhoods to violence, Dr. Fagan found "a systematic pattern of the spread of gun violence from one neighborhood to another." Tr. 1480. Non-gun homicide, in contrast, was not contagious. Tr. 1478. The analogy to spread of a dangerous disease is fitting.

The "internalization of gun process as part of social identity" among young urban males, Tr. 1494, significantly diminishes the role of free will in the choice to use a gun, Dr. Fagan declared:

> If somebody presents ... with an hostile intent to an individual who is walking down the street, that person has very little choice but to decide whether to engage or run, and if they engage in some kind of violent act with that person, of course that raises the risk of some deadly type of event. And if they run, it places them at greater risk to being attacked in the next event. So the choices they have are often circumscribed, narrowed, compared to what other people have in a broad range of events in kinds of neighborhoods where they have a broad range of activities, free will is compromised.

Tr. 1524.

Dr. Fagan's research together with all the other evidence was sufficient to persuade a reasonable jury of a causal link between exposure to handguns and an increased likelihood that disputes and confrontations involving youths and adolescents will end in serious injury and death.

Sufficient evidence tying Mr. Adkins' "possession of the [Fox] gun to the operation of the underground market attributable to the defendants' mode of marketing" has been presented. *Hamilton v.*

*Accu–Tek,* 935 F.Supp. 1307, 1332 (E.D.N.Y.1996). The jury could have concluded from the available evidence (1) that defendants manufacture .25 caliber handguns and sell them in a national market, including in "weak" gun law states,(2) that it was likely that .25 caliber handguns defendants sold without taking reasonable precautions to prevent their entry into the underground market found their way into New York, and (3) that Stephen Fox was shot with a .25 caliber handgun illegally acquired from that underground market. This evidence, considered in conjunction with the evidence supporting the jury's finding that American Arms, Inc., Beretta U.S.A. Corp. and Taurus International Manufacturing, Inc. did market and distribute handguns negligently, was sufficient to permit a rational jury to causally and proximately connect these defendants' negligence to Stephen Fox's injuries.

These guns were fungible. It made no difference to the shooter which .25 caliber weapon he used. *See Hamilton v. Accu–Tek,* 32 F.Supp.2d 47 (E.D.N.Y.1998). As noted, because market share liability applies, Mr. Fox did not need to link his injuries to an act or omission by the manufacturer of the particular gun which caused his injury. His burden was satisfied by the presentation of evidence from which rational jurors could conclude that negligence on the part of each of the Fox defendants, as a manufacturer of .25 caliber handguns contributing to the national market in illegal .25 caliber guns, was a substantial factor in bringing about Mr. Fox's injuries.

While the firearm used to shoot Mr. Fox was not found, shell casings recovered from the crime scene revealed that he had been shot with a .25 caliber handgun. See Part II.A, supra. From perusal of the catalogues entered into evidence at trial, the jury could have concluded that each of the Fox defendants manufactured .25 caliber handguns. From national market share statistics the jury could extrapolate and estimate the market share of each

manufacturer of .25 caliber guns. The short "time-to-crime" period of most crime guns would support a finding that the gun had been manufactured within a few years of the Fox shooting. Since the percentage of handguns manufactured did not vary appreciably over short periods, the jury was justified in relying on general statistics on market share over a period of a few years preceding the shooting even if they could not determine the exact year in which the particular gun used to shoot Mr. Fox was sold by the manufacturer. In this connection, evidence that manufacturers do not carry over supply of handguns from year to year, Tr. 571, supported the jury's findings of percentages of market share for .25 caliber handguns. *See* further discussion in Part IV.D.4.b, *infra.*

Mr. Adkins, the shooter, was not licensed to possess a handgun in New York State. Under twenty-one, he could not have possessed a handgun lawfully in New York. Mr. Fox testified at trial that approximately one and one half months before he was shot, he saw Mr. Adkins purchase a small black handgun out of the trunk of a car in Queens. According to Mr. Fox's testimony, Mr. Adkins brandished this same gun in his face sometime later. Just before he was shot, Mr. Fox testified, he saw the gleam of a small black object in Mr. Adkins' hands. Tr. 1719–24.

The specifics of the gun's acquisition by Mr. Adkins are immaterial. There was sufficient evidence in the record from which the jury could have concluded that the gun was initially diverted from a lawful retail source before Mr. Adkins acquired it, and thus that its presence in the illegal market and Mr. Adkins' access to it were attributable to defendants' negligent marketing and distribution practices.

The testimony of Joseph Vince that most guns used in crime are not stolen but trafficked from retail sources has already been adverted to. *See* Part IV.D.2.b, *supra.* Mr. Vince also testified to criminals' preference for new guns, ones that are "new in the box," and therefore relatively "safe" in that they have no prior homicides attached which can be traced and attributed to subsequent purchasers. Tr. 1622. With regard to New York City crime guns in particular, Lieutenant McCann testified that of guns seized by the joint NYPD/ATF task force on illegal trafficking while he was director, "a very, very small percentage were reported stolen." Tr. 488. This evidence was sufficient to permit rational jurors to infer that the gun used to commit the Fox crime, like the majority of crime guns, made its way into the underground market via an initial lawful sale that might have been prevented had the manufacturers insisted on more stringent selling procedures as a condition for supplying guns to their distributors.

Dr. Stewart's testimony that handgun manufacturers could feasibly reduce the risks associated with their product by exercising greater control over retail sales, *see* Part IV.D.2.b, *supra,* and that their failure to do so "has been a significant contributing factor in the development of an illegal market," Tr. 1337, provides further support for the jury's finding of proximate cause. Additional support for this finding was provided by Lieutenant McCann, who testified that since stocking gun dealers were generally more responsible retailers who tended not to permit or engage in illegal trafficking activities, limiting initial gun sales to such dealers would greatly reduce the number of guns entering the illegal market. Tr. 419. The evidence of the origin of most New York crime handguns in retail sales outside New York, the general practices surrounding the making of those sales, and the degree of supervision or its lack over first retail sales, was sufficient to permit a reasonable jury to conclude that the negligent marketing and distribution of handguns by manufacturers was a substantial factor in the promotion and development of an underground illegal market supplying New York criminals, and thus increasing the probability of death or serious injury such as that suffered by Mr. Fox.

None of the testimony as to other guns used to shoot the other six people described in Part II, *supra*, was prejudicial to the defendants in the Fox case. It would have been admissible under Rules 401 to 403 even if the Fox case had been tried alone. The jury was instructed to treat each case separately and the diverse jury verdicts rendered in each case revealed that they did so.

To sum up, there was sufficient evidence to persuade a rational jury that criminal misuse of handguns was a reasonably foreseeable result of defendants' negligent marketing and distribution practices; that easy access to illegal guns increases gun violence and homicide; that Mr. Adkins shot Mr. Fox with an unlawfully obtained handgun of a type that the Fox defendants manufactured; that this .25 caliber crime gun was originally diverted from a lawful retail source; that the gun used would not have been available to Mr. Adkins had the Fox defendants taken reasonable preventive measures; and thus that defendants' negligence proximately caused Stephen Fox's injuries. In addition, the proportion of .25 caliber handguns marketed by each defendant in the year the particular gun used to shoot Fox was sold could be, and was, estimated reliably. *See* Part IV. D.4.b, *supra.*

### 4. Apportionment of Liability

#### a. Law

Predicting whether the New York Court of Appeals would impose collective liability in this case requires analysis of existing precedent as well as policy considerations on which that and other courts have relied in relaxing the traditional requirements of specific causation by defendants to avoid unjust results.

#### i. Available Theories

Four theories of collective liability are recognized under New York law: alternative, enterprise, concerted action, and market share. *See, e.g., Hymowitz v. Eli Lilly & Co.,* 73 N.Y.2d 487, 539 N.E.2d 1069, 541 N.Y.S.2d 941, *cert. denied,* 493 U.S. 944, 110 S.Ct. 350, 107 L.Ed.2d 338 (1989) (market share liability); `Finn v. Morgan,* 46 A.D.2d 229, 362 N.Y.S.2d 292 (1974) (concerted action liability); *Hall v. E.I. Du Pont De Nemours & Co.,* 345 F.Supp. 353 (E.D.N.Y.1972) (enterprise, or industry-wide liability). In each of these theories, liability of a single causative defendant in the traditional case is replaced with liability of a group of defendants. The basic features of this approach to mass torts have already been described in an earlier Memorandum in the instant case. *See Hamilton v. Accu–Tek,* 935 F.Supp. 1307, 1327–28 (E.D.N.Y.1996). *See generally,* Tyrone Hughes, Note, *Hamilton v. Accu–Tek: Potential Collective Liability of the Handgun Industry for Negligent Marketing,* 13 Touro L.Rev. 287 (1996).

With the exception of concerted action liability, the collective liability theories function essentially as default rules triggered by the plaintiff's inability to identify the particular defendant whose tortious act or omission caused his or her injury. *See, e.g., In re DES Cases,* 789 F.Supp. 552, 564 (E.D.N.Y.1992) (market share liability "apparently is a default rule: one-hundred percent liability will still be assessed against a single manufacturer where it can be shown that its product was the only one taken by the plaintiff's mother" (citing *Rubel v. Eli Lilly & Co.,* 1991 WL 29895, at *5 (S.D.N.Y.1991))); *Hall,* 345 F.Supp. at 383 (declining to apply enterprise liability where manufacturers of blasting caps that injured plaintiffs were known); Restatement (Second) of Torts § 433B (1965).

The foundation for one form of alternative liability was explicated in the famous case of *Summers v. Tice,* 33 Cal.2d 80, 199 P.2d 1 (1948), in which two hunters simultaneously shot at a third from equal distances with identical 12–gauge shotguns, so that it was impossible to determine which of the two shooters had fired the injury-causing shot. The theory was later summarized as follows in § 433B(3) of the Restatement (Second) of Torts:

Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

Courts applying alternative liability in its simplest form have sometimes required that all responsible parties be before the court and that each defendant have engaged in simultaneous tortious conduct. *See, e.g., Smith v. Cutter Biological, Inc.*, 72 Haw. 416, 823 P.2d 717, 725 (1991). *But see Poole v. Alpha Therapeutic Corp.*, 696 F.Supp. 351, 356 n. 3 (N.D.Ill.1988) (simultaneity of tortious conduct not required); *Ferrigno v. Eli Lilly & Co.*, 175 N.J.Super. 551, 420 A.2d 1305, 1314 (Law Div.1980) (presence of all tortfeasors before court not required). The theory has been found useful in such cases as those involving car pile-ups, pollution by several defendants and injuries to patients during surgery. *See Smith*, 823 P.2d at 725 (citing *In Re Agent Orange Product Liability Litig.*, 597 F.Supp. 740, 832–823 (E.D.N.Y. 1984)), but has sometimes been rejected in toxic tort cases. *See, e.g., Hymowitz*, 73 N.Y.2d at 506, 539 N.E.2d at 1074, 541 N.Y.S.2d at 946.

■ Plaintiffs asserting concerted action liability must present evidence of an express or tacit agreement to engage in a tortious act. *See Hymowitz*, 73 N.Y.2d at 506, 539 N.E.2d at 1075, 541 N.Y.S.2d at 947 (1989). Each participant in the agreed-upon tortious activity—a drag race, for example—is held liable for the acts of his or her confederates. *See, e.g., Finn v. Morgan*, 46 A.D.2d 229, 232, 362 N.Y.S.2d 292, 297 (4th Dep't 1974) ("[P]articipation in the race is the equivalent of participation in the accident. The race itself was the joint tort and defendant was liable to an injured person notwithstanding the fact that he may not have been chargeable with a distinct act of negligence."); *see also* Prosser & Keeton § 46.

■ Enterprise liability was described in *Hall v. E.I. Du Pont De Nemours & Co.*, 345 F.Supp. 353 (E.D.N.Y.1972), a suit concerning children injured by exploding blasting caps, who, due to the destruction of identifying insignia in the explosions, were unable to determine which of several manufacturers had produced the caps which injured them. The hallmark of enterprise liability—or industry wide liability, as it is also known—is joint control of risk through an industry trade association or other industry-wide custom, practice or mechanism for the setting of safety standards. *Id.* at 379. *See* Richard J. Heafey & Don M. Kennedy, *Product Liability* § 10.04; *cf.* Thomas J. Lavelle, *The Future of "Superfund" Sites: A Primer for the Next Generation*, 10 UCLA J. Envtl L. & Pol'y 283, 291–309 (1992) (arguing that enterprise liability is the most viable theory of recovery for plaintiffs injured by hazardous waste); Naomi Sheiner, Comment, *DES and a Proposed Theory of Enterprise Liability*, 46 Fordham L.Rev. 963 (1978) (enterprise liability best solution to problems of causation posed by DES).

■ Market share liability has been more widely applied in the toxic tort arena than have the other forms of collective liability. The theory was developed in response to the unique problems of proof raised by the DES litigation. Due to the generic chemical composition of the drug, the many manufacturers producing it, and the long latency period between exposure and disease, large numbers of plaintiffs were unable to identify the manufacturer of the pills ingested by their mothers and thus to meet the traditional tort law requirement of cause-in-fact. *See generally* Hon. Helen E. Freedman, *Product Liability Issues in Mass Torts*, 1999 Touro L.Rev. 685, 692–94 (discussing product identification problems in DES and asbestos litigation). Rather than leave these plaintiffs remediless, a number of courts—beginning with the California Supreme Court in *Sindell v. Abbott Lab.*, 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924, 937

(1980)—eliminated the identification requirement, predicating liability instead on defendants' creation of risk through participation in the DES market. The rationale of these cases is that an individual defendant's share of liability should be based on the probability that its product actually caused the harm. This probability was estimated by the legal rule that market share of the product was the surrogate for probability of specific causation.

Market share liability has been extended to other areas. *See, e.g., Smith v. Cutter Biological Inc.,* 72 Haw. 416, 823 P.2d 717 (1991) (blood products); *Ray v. Cutter Lab.,* 754 F.Supp. 193 (M.D.Fla.1991) (same); *Morris v. Parke, Davis & Co.* 667 F.Supp. 1332 (C.D.Cal.1987) (vaccines); *Richie v. Bridgestone, Inc.,* 22 Cal.App. 4th 335, 27 Cal.Rptr.2d 418 (1st Dist.1994) (asbestos lined brake pads); *Wheeler v. Raybestos–Manhattan,* 8 Cal.App.4th 1152, 11 Cal.Rptr.2d 109 (1st Dist.1992) (same); *Jackson v. Glidden Co.,* 98 Ohio App.3d 100, 647 N.E.2d 879 (8th Dist.1994) (lead paint); *Brenner v. American Cyanamid Co.,* No. 12596/93 (Sup.Ct. Erie Cty. January 25, 1995) (same); *cf. Shackil v. Lederle Lab.,* 116 N.J. 155, 561 A.2d 511, 529 (1989) (noting court's openness to market share theory in appropriate context but declining to adopt it in suit against vaccine manufacturers in view of alternate route of recovery under federal statute and detrimental effect of imposing liability on struggling DPT vaccine industry).

When the New York Court of Appeals adopted market share liability in *Hymowitz,* it emphasized that up to that point, "the DES situation [was] a singular case." *Hymowitz,* 73 N.Y.2d at 508, 539 N.E.2d at 1075, 541 N.Y.S.2d at 947. The court did not express an intention to limit the theory's application to DES litigation should a new category of events support its expanded use as a matter of public policy. Such a rigid limitation would have been inconsistent with the rationale of *Hymowitz* itself as well as with that the Court of Appeals' long tradition of extending the boundaries of products liability law as the needs of contemporary society required. *See, e.g., Bichler v. Eli Lilly & Co.,* 55 N.Y.2d 571, 579–80, 436 N.E.2d 182, 185, 450 N.Y.S.2d 776, 779 (1982) ("Products liability law cannot be expected to stand still where innocent victims face inordinately difficult problems of proof."); *Codling v. Paglia,* 32 N.Y.2d 330, 339, 298 N.E.2d 622, 626, 345 N.Y.S.2d 461, 466 (1973) ("The dynamic growth of the law in this area has been a testimonial to the adaptability of our judicial system and its resilient capacity to respond to new developments."); *MacPherson v. Buick Motor Co.,* 217 N.Y. 382, 391, 111 N.E. 1050, 1053 (1916) ("Precedents from the days of travel by stage coach do not fit the conditions of travel today. The principle ... does not change, but the things subject to the principle do change. They are whatever the needs of life in a developing civilization require them to be.").

ii. Policy Considerations

Decisions to impose collective liability have been grounded in both moral and pragmatic considerations. A primary motivating factor has been the injustice of barring innocent plaintiffs' recovery solely because of their inability to identify which of a number of wrongdoing defendants caused their injuries. *See, e.g., Smith v. Cutter Biological, Inc.,* 823 P.2d at 728 ("equity and fairness calls for using the market share approach"); *Collins v. Eli Lilly & Co.,* 116 Wis.2d 166, 342 N.W.2d 37, 49 (1984) ("as between the plaintiff, who probably is not at fault, and the defendants, who may have provided the product which caused the injury, the interests of justice and fundamental fairness demand that the latter should bear the cost of injury"); *Sindell,* 163 Cal.Rptr. 132, 607 P.2d at 936 ("The most persuasive reason for finding plaintiff states a cause of action is that advanced in *Summers:* as between an innocent plaintiff and negligent defendants, the latter should bear the cost of the injury."); *Hall v. E.I. Du Pont De Nemours,* 345 F.Supp. 353, 371 (1972) (un-

fairness of denying innocent injured plaintiffs recovery because proof of causation was within defendants' control or unavailable).

Courts adopting collective liability have pointed to defendants' superior ability both to absorb and to minimize the costs associated with their activities. *See, e.g., Hall,* at 378 ("The point is not only that the damage is caused by multiple actors, but that the sole feasible way of anticipating costs or damages and devising practical remedies is to consider the activities of a group."); *Smith,* at 727 (defendants may bear loss by passing on costs to consumers); *Collins,* 342 N.W.2d at 49 (defendants may either insure against costs of injuries, absorb them, or pass them on).

Also relied upon in imposing market share liability have been the potentially deterrent effect of imposing collective liability, the helplessness of plaintiffs, and the magnitude of the harm inflicted. *See e.g., Collins* at 49 (cost of damages will provide drug companies with an incentive to adequately test their products); *McCormack v. Abbott Lab.,* 617 F.Supp. 1521, 1526 (D.Mass.1985) ("the magnitude of the physical and psychological injuries which are at issue in DES cases counsels toward permitting a remedy under some form of a market-share theory of liability"); *Sindell,* 163 Cal.Rptr. 132, 607 P.2d at 936 (factors weighing in favor of eliminating identification requirement of particular significance where plaintiffs are virtually helpless to guard against medication-related risks).

An important theme running through all of the market share cases is the expanding nature of tort law and the need for courts to adapt traditional theories of recovery to keep pace with the evolving requirements of contemporary society. *See, e.g., Smith,* 823 P.2d at 724 ("No longer can we apply traditional rules of negligence . . . . The problem calls for adopting new rules of causation for otherwise innocent plaintiffs would be left without a remedy."); *Collins,* 342 N.W.2d at 52 n. 12 ("It is the function of this court to modify the existing com-

mon law if that becomes necessary to promote justice under the law."); *Sindell,* 163 Cal.Rptr. 132, 607 P.2d at 936 ("The response of the courts can be either to adhere rigidly to prior doctrine, denying recovery to those injured by such products, or to fashion remedies to meet these changing needs.").

Expansion of both substantive and procedural law in mass torts to permit appropriate compensation to those injured by negligent manufacturers is a necessary aspect of the law's role as protector of the public against massive delicts. *See, e.g.,* Margaret A. Berger, *Eliminating General Causation: Notes Towards a New Theory of Justice and Toxic Torts,* 97 Colum. L.Rev. 2117 (1997); David Rosenberg, *The Causal Connection in Mass Exposure Cases: A "Public Law" Vision of the Tort System,* 97 Harv. L.Rev. 849 (1984).

The New York Court of Appeals has, as already pointed out, been particularly responsive to the needs of today's plaintiffs struggling against doctrinal barriers erected to accommodate litigants of an earlier era. In *Hymowitz,* the Court of Appeals noted its multiple prior modifications of the rules of personal injury "in order to achieve the ends of justice in a more modern context" and declared that, "here judicial action is again required to overcome the inordinately difficult problems of proof caused by contemporary products and marketing techniques." *Hymowitz,* 73 N.Y.2d at 507, 539 N.E.2d at 1074, 541 N.Y.S.2d at 946 (citations and internal quotation marks omitted).

New York's approach to market share liability is in some sense more radical than that of other courts which have adopted the theory. In contrast to other versions of market share, under the rule laid down in *Hymowitz,* defendants who are able to prove that they could not have made the particular DES pills which caused a given plaintiff's injury—e.g., because they sold only to certain pharmacies or because their pills were more easily identifiable—are not

permitted to exculpate themselves. *Hymowitz*, 73 N.Y.2d at 512, 539 N.E.2d at 1078, 541 N.Y.S.2d at 950. Such "fortuities," the court reasoned should not inure to the benefit of these equally culpable defendants. *Accord Smith*, 823 P.2d at 728 (adopting *Hymowitz*). *But see Conley v. Boyle Drug Co.*, 570 So.2d 275, 286 (Fla.1990) (exculpation permitted based on proof that defendant did not market DES of type ingested by plaintiff's mother or did not market DES in relevant geographical area); *Martin*, 689 P.2d at 382 (same); *Sindell*, 163 Cal.Rptr. 132, 607 P.2d at 937 (a defendant can avoid liability by showing that it did not manufacture the DES that injured plaintiff).

#### b. Application

Alternative, enterprise and concerted action theories of collective liability need not be applied to these handgun cases. Alternative liability is inappropriate for largely the same reasons the *Hymowitz* court deemed it inapplicable to DES: a large but fluctuating number of potential wrongdoers, equivalency of defendants' and plaintiffs' positions in terms of the ability to identify the manufacturer whose product caused the injury, and the unfairness of imposing joint and several liability where the probability that any one defendant's product actually injured the plaintiff is small.

The heart of enterprise liability, as already pointed out, is joint control of risk. Concerted action liability requires proof of an express or tacit agreement to engage in tortious conduct. Plaintiffs in the instant cases have presented insufficient evidence of both. From the outset plaintiffs' only allegations in either regard concerned lobbying activities protected by the First Amendment. Under the *Noerr–Pennington* doctrine, liability may not be predicated solely upon such activities. *See Hamilton v. Accu–Tek*, 935 F.Supp. 1307, 1321 (1996).

Many of the same factors which have previously led the New York Court of Appeals and other courts to relax the traditional rules of causation militate heavily in favor of the imposition of market share liability in the instant case. First, as in the case of DES, handgun plaintiffs are faced with intractable problems of proof. A large proportion of crime guns are never recovered. Expert evidence at trial supported the conclusion that the ability to determine the precise make of a gun through analysis of expended bullets and shell casings is limited. Thus, even though ballistics may help to eliminate possible manufacturers from consideration, plaintiffs usually are still faced with a group of wrongdoers none of whose conduct can definitively be established as an "actual" cause of damages.

Contemporary developments are relevant in deciding legal policy in favor of market share liability. The proliferation of illegal handguns in urban areas, the resultant epidemic of handgun violence among urban youth, and the gun industry's design and sale of increasingly lethal readily concealed and cheap handguns have created a crisis in today's cities. Many have now filed suits against handgun manufacturers. *See, e.g.*, Robert Soro, *Calif. Cities, Counties Sue Firearms Makers*, Wash. Post, May 26, 1999, at A14; The Times Picayune, *St. Louis Is Latest City to Sue Gun Makers*, May 1, 1999, at A12; United Press International, *Cincinnati Files Handgun Lawsuit*, April 29, 1999; Vanessa O'Connell, *Cleveland Becomes the Sixth City to Sue a Group of Gun Makers*, Wall St. J., April 9, 1999, at B6.

The same factors compelling recognition of a duty, *see* Part IV.D.1.b, *supra*, support the imposition of market share liability: (1) the superior ability of defendants to bear the costs foreseeably associated with the manufacture and widespread distribution of handguns; (2) the fairness of requiring them to do so since they can reduce the risks by their ability to choose merchandising techniques; (3) the deterrent potential of placing the burden on

manufacturers careless of their responsibilities to the public; and (4) the fact that injured plaintiffs, unlike the users of products which later turn out to be defective, did not choose their connection with handguns. Under such circumstances the law will not leave the injured unrequited.

Handguns, already found to be fungible for jurisdictional purposes, see *Hamilton v. Accu–Tek*, 32 F.Supp.2d 47 (E.D.N.Y. 1998), may also be deemed fungible for substantive law purposes. From the point of view of the criminals using them, there are no relevant differences between handguns. As a criminal co-defendant in one of the shootings put the matter in deposition testimony read into the record at trial:

> [W]here I'm from you don't really care who manufactures them. You just get your hands on them and, you know, that's how that goes.... I never really take the time to look at who makes it, whose name is on it, or, you know, it's not important to me.

Tr. 2341. The fungibility of handguns, and, thus, their amenability to market share analysis is even clearer when viewed from the vantage point of shooting victims.

Plaintiffs have maintained that liability in these cases should be predicated on the degree of risk posed by a given manufacturer through its participation in the illegal handgun market, even where the identity of the maker of an individual handgun is known. Because each manufacturer's contribution to the pool of illegal guns helps to place killing instruments into the hands of criminals, the argument goes, each should be held partially responsible for the resulting injury and death. It is the underground market itself, created and stocked by the defendants' negligence—rather than any one manufacturer's product—which the plaintiffs regard as the cause of their injuries. Apt is the analogy to a stream polluted by many manufacturers at once, overwhelming the water's ability to purify itself due to the huge influx of the many polluters.

The argument of general market share for all handguns has some merit, but it is not required by New York law as so far laid down by the Court of Appeals in *Hymowitz*. As noted, market share liability has thus far been a rule of last resort, triggered only by the impracticability of identifying the manufacturer of the injury-causing instrumentality. In other cases, the traditional rule obtains. A conservative view of the law is to reason that, just as full market share theory was unavailable to those plaintiffs who knew the manufacturer of the DES pills taken by their mothers, it should be unavailable against manufacturers whose handguns are known to be incapable of causing the particular injury—here non .25 caliber handguns.

In *Hymowitz*, it will be recalled, all manufacturers of DES who marketed the drug for pregnancy purposes were grouped together into a single market notwithstanding cosmetic and other differences which could have been used to narrow the field of potential defendants. See *Hymowitz*, 73 N.Y.2d at 512, 539 N.E.2d at 1078, 541 N.Y.S.2d at 950. Such an approach was justifiable in the DES context because of the identical chemical composition of each pill. Proof adduced at the Fox trial, however, reveals that unrecovered handguns—unlike DES—while fungible in many respects, possess class characteristics which differentiate them from one another. The caliber of such guns is often ascertainable from bullets in bodies and shell casings found at the scene of the shooting. Ballistics can help to further refine the universe of potential manufacturers. Thus, for example, bullets and casings recovered at the locus of the Fox crime revealed that a .25 caliber firearm was used in the shooting. Based on additional analysis, defendants' ballistics expert named five defendants as possible manufacturers of the gun in the Fox shooting: American Arms Inc., Beretta, Colt, Jennings, and Phoenix. Plaintiffs' expert's analysis was inconclusive.

A gun's caliber measures the width of its barrel. Its other class characteristics derive from markings made on a bullet as it passes through the barrel or on the shell as it is marked in firing and ejection. These physical attributes serve to distinguish one gun from another in palpable ways. If the gun itself is recovered it usually can be matched to the markings on the bullet and shell casing. But, even if the gun is not recovered—as in the Fox shooting—its caliber, class and sometimes even the particular manufacturer's machines that made it, can often be determined.

Gun class characteristics are arguably unlike those variations of color and shape which the *Hymowitz* court held to be inconsequential differences among otherwise indistinguishable products. *Cf. Wheeler v. Raybestos–Manhattan,* 8 Cal.App.4th 1152, 11 Cal.Rptr.2d 109 (1st Dist.1992) (market share liability applied to asbestos-lined brake pads which, while "not absolutely interchangeable each for one another and hence … not fungible from the standpoint of an auto mechanic … are fungible for purposes of *Sindell* by virtue of containing roughly comparable quantities of the single asbestos fiber, chrysotile").

The ability to group handguns by class characteristics does not render market share liability inapplicable to these products. In view of the compelling arguments in favor of applying market share theory to the instant cases, adaptation of the *Hymowitz* rule to reflect this unique feature of handguns is appropriate. Accordingly, the jury was instructed that as to any given gun, there were three possibilities. First, the jury could find that no party had proven that the gun was made by any particular manufacturer or group of manufacturers. In such a case, the jury was instructed to apportion liability in proportion to each manufacturer's market share of all handguns. Second, the jury could find that it had been proven that the gun had been made by a particular manufac-

turer. In such a case, the jury was instructed to assess 100 percent of plaintiff's damages against the manufacturer found to have made the gun. Finally, the jury could find that only a limited number of manufacturers—a class of manufacturers—could have made the gun in question. For example, it could find that the gun used was a .25 caliber gun, or a .38 caliber one, or one with other class characteristics, and that only one of a number of manufacturers could have made it. In such a case, the jury was instructed to apportion liability according to each manufacturer's market share for that class of guns.

Such an adaptation of *Hymowitz* strikes a balance between the needs of the injured plaintiffs and tort law's traditional focus on individual responsibility. *See, e.g.,* Robert A. Baruch Bush, *Between Two Worlds: the Shift from Individual to Group Responsibility in the Law of Causation of Injury,* 33 UCLA L.Rev. 1473 (1986). It constitutes, as already noted, a conservative view of the *Hymowitz* precedent.

Defendants maintain that a market share instruction was not warranted here because handgun market share is not an accurate gauge of the degree of unreasonable risk produced by each negligent manufacturer. This is so, defendants contend, because each defendant's market share includes all sales, and the ratio of negligent to non-negligent sales may vary from manufacturer to manufacturer. Where the sale of DES was concerned, in contrast, each sale of a pill was tortious. This argument must be rejected. First, those defendants who placed restrictions on sales were found non-negligent by the jury. The precise breach alleged and proved against the others was their overall policy and practice of indiscriminate marketing and distribution of handguns. Given the nature of the breach, as found by the jury, any variations in the ratio of tortious to non-tortious sales among the negligent defendants must be regarded as accidental and irrelevant rather than a reflection of differing degrees of culpability. *Cf. Smith*

*v. Cutter Biological Inc.,* 72 Haw. 416, 823 P.2d 717, 722 (argument that market share was inapplicable because not all batches of blood factor were tainted rejected where breaches alleged were failure to warn and failure to screen donors). Under these circumstances, defendants' national market share—whether of total guns produced or by class of gun—is "an equitable way to provide plaintiffs with the relief they deserve, while also rationally distributing the responsibility for plaintiffs' injuries among defendants." *Hymowitz,* 73 N.Y.2d at 512, 539 N.E.2d at 1078, 541 N.Y.S.2d at 950.

Finally, defendants take issue with plaintiffs' failure to produce either a breakdown of defendants' market shares by caliber of handgun or evidence of the year of sale of the Fox gun. The absence of such direct evidence is not fatal to the verdict since evidence in the case supported the inference drawn by the jury as to market share for .25 caliber guns for relevant periods. *See* Part IV.D.3.b, *supra.*

It need not now be decided which party should have the burden of identifying the particular manufacturer or class of manufacturers. Here, the ballistics evidence was so overwhelming that the burden of proof assignment was irrelevant. It should merely be noted that the court of appeals for the Second Circuit in a recent manufacturer's liability case seemed to suggest shifting some aspect of the burden of proof to the defendant when it wrote:

> When a defendant's negligent act is deemed wrongful precisely because it has a strong propensity to cause the type of injury that ensued, that very causal tendency is evidence enough to establish a *prima facie* case of cause-in-fact. The burden then shifts to the *defendant* to come forward with evidence that its negligence was *not* such a but-for cause.

*Liriano v. Hobart Corp.,* 170 F.3d 264, 271 (2d Cir.1999) (emphasis in original) (Calabresi, J.).

### 5. Damages

#### a. Law

■ Inaccuracies in a jury's damage award do not make it the fruit of "sheer surmise or conjecture" such as to require rejection of the verdict. *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 429 (2d Cir. 1995). Some imprecision is inevitable in all cases which require a jury to apportion responsibility among multiple tortfeasors. The problem is built into a system of liability calculated on the basis of market share. As the California Supreme Court put the matter in *Sindell:*

> It is probably impossible, with the passage of time, to determine market share with mathematical exactitude. But just as a jury cannot be expected to determine the precise relationship between fault and liability in applying the doctrine of comparative fault, the difficulty of apportioning damages among the defendant producers in exact relation to their market does not militate against the rule we adopt. As we said in Summers with regard to the liability of independent tortfeasors, when a correct division of liability cannot be made, 'the trier of fact may make it the best it can.'

*Sindell v. Abbott Lab.,* 607 P.2d at 937 (quoting *Summers v. Tice,* 33 Cal.2d 80, 199 P.2d 1, 5 (1948)).

#### b. Application

■ The jury's assessment of damages cannot be characterized as speculative. It had before it, as already pointed out, evidence of defendants' shares of the national handgun market aggregated over the period between 1989 and 1994. It was not unreasonable for the jury to infer, as it did, that the national market shares of American Arms, Inc., Beretta U.S.A. Corp., and Taurus International Manufacturing, Inc. did not deviate appreciably from these aggregated figures either from year to year or according to class of handgun. To the extent that Dr. George Benston, defendants' economist, may be understood to have testified that market share

figures change from year to year, the jury could reasonably have concluded that any such changes over a few years were *de minimis*, at least with regard to the Fox defendants. Drawing all reasonable inferences in favor of the plaintiffs, the evidence of market share was sufficient to support the jury's allocation of damages.

## V. NEW TRIAL

When the court of appeals reverses a trial court's denial of a motion for judgment as a matter of law, it has discretion to order a new trial or to remand for a determination of whether a new trial should be granted. *See* Fed.R.Civ.P. 59(d); 9A Charles A. Wright & Arthur R. Miller § 2540, at 371–72. Should the court determine that reversal is warranted on the ground of insufficiency of the evidence regarding .25 caliber handguns, exercise of this discretion to order a new trial would seem to be appropriate. Plaintiffs may on retrial be able to demonstrate with greater precision the year of acquisition of the .25 caliber gun used to wound Mr. Fox and defendants' market share for that year for that type of gun.

## VI. CERTIFICATION

It is respectfully recommended that the panel for the court of appeals reviewing this decision certify state law issues to the New York Court of Appeals, whose interpretations, under *Erie*, control. In a related, but distinguishable case, *McCarthy v. Olin Corp.*, 119 F.3d 148 (2d Cir.1997), the federal court of appeals panel was divided on the New York rule.

Necessarily, a federal court of appeals must be more conservative in dealing with state law than the highest state court, since it is limited by its reading of state precedents and will tend not to make a sharp break with what it conceives to be existing or prior state law. It is unlikely, for example, that a federal court would have decided such cases as *MacPherson v. Buick Motor Co.* or *Hymowitz* as the New York Court of Appeals did. A state's

highest court has much more flexibility. For example, it may designate "some doctrines or decisions as provisional, promising to revisit these matters at a future date." Michael C. Dorf, *The Limits of Socratic Deliberation,* 112 Harv. L.Rev. 4, 73 (1998).

Neither the New York Court of Appeals rule implementing the relevant state constitutional provision nor the federal provisions providing for certification to New York's highest court allows for a decision to certify by the district courts in the Second Circuit. *See* 22 NYCRR § 500.17; Second Circuit Local Rule 0.27. Under the certification provisions of the majority of other states, district courts can certify directly without going through the circuit court. *See* 17A Charles Alan Wright et al.; *Federal Practice and Procedure* § 4248, at 167 n. 31 (1988 & Supp. 1998). Nevertheless, it does seem consistent with the proper relationship between federal appeals courts and district courts for the latter to make suggestions on certification issues. It must be remembered that no federal court can speak to questions of state law with any certitude. *See, e.g. Benjamin v. Jacobson,* 172 F.3d 144, 191, (2d Cir.1999) (en banc) (Calabresi, J., concurring) (noting "federal judges' too ready assumption of their own capacity to ascertain state law"); *McCarthy v. Olin Corp.,* 119 F.3d 148, 157 (2d Cir.1997) (Calabresi, J., dissenting) (certification avoids problem of excessive determination of state law by federal judges). It is for this reason that it has sometimes been suggested that in *Erie* matters the district courts need not follow as strictly as they would interpretations of federal law by federal courts of appeals, particularly where the law is in the process of development. *See, e.g.,* Jed I. Bergman, Note, *Putting Precedent in its Place: Stare Decisis and Federal Predictions of State Law,* 96 Colum. L.Rev. 969 (1996) (arguing that under *Erie,* federal predictions of state law should be only provisionally binding); Nikoforos Matthews, Note, *Circuit Court*

*Erie Errors and the District Court's Dilemma: From Rotolith and the Mirror Image Rule to Octagon Gas and Asset Securitization,* 27 Cardozo L.Rev. 739 (1996) (arguing that *Erie* does not require strict adherence to circuit courts' predictions on matters of state law where no relevant state court decisions exist); *cf. Pahuta v. Massey–Ferguson, Inc.,* 170 F.3d 125, 134 (2d Cir.1999) (Sack, J.) (given lack of controlling precedent from highest state court and fact that applicability of doctrine developed by intermediate appellate courts was uncertain, author of opinion would have been inclined to certify question to New York Court of Appeals).

## VII. CONCLUSION

Defendants' motion for judgment as a matter of law is denied. Their motion to dismiss is denied. Plaintiffs' Rule 15(b) motion to amend the pleadings to conform to the proof is granted. Judgment is entered as follows:

All cases are dismissed against Arcadia Machine & Tool, Inc., Browning Arms Co., Bryco Arms, Calico Light Weapons Systems, Inc., Charco, Inc., Colt's Manufacturing Co., Inc., Davis Industries, Inc., European American Armory, Corp., Freedom Arms Co., Glock, Inc., H & R 1871, Inc., K.B.I., Inc., Navegar, Inc., d/b/a Intratec Firearms, Para–Ordnance Manufacturing, Inc., Phoenix Arms, Inc., Sigarms, Inc., Smith & Wesson Corp., Springfield, Inc., Sturm, Ruger & Co., Inc., and Sundance Industries, Inc.

Judgment is entered against American Arms, Inc. in favor of Steven Fox in the amount of $9085 and for Gail Fox in the amount of $115; against Beretta U.S.A. Corp., in favor of Steven Fox in the amount of $238,185, and for Gail Fox in the amount of $3015; and against Taurus International Manufacturing, Inc. in favor of Steven Fox in the amount of $268,600, and for Gail Fox in the amount of $ 3400.

No costs or disbursements are awarded against any party. *See* Fed.R.Civ.P. 54(d).

So ordered.

## APPENDIX A—RELEVANT PORTIONS OF JURY INSTRUCTIONS

### ESSENTIAL ELEMENTS OF PLAINTIFFS' CLAIMS

In order to prove the essential elements of a claim against a defendant, the burden is on each plaintiff to establish, by a preponderance of the evidence in the case, the following facts against that defendant:

*First,* that the defendant was negligent in one or more of the particulars alleged; AND

*Second,* that the defendant's negligence was a substantial factor in bringing about the injuries and consequent damage sustained by the plaintiff; AND

*Third,* the damages sustained by the plaintiff as a result.

### NEGLIGENCE DEFINED

Negligence is lack of ordinary care. It is a failure to use that degree of care that a reasonably prudent manufacturer would have used under the same circumstances. Negligence may arise from doing an act that a reasonably prudent manufacturer would not have done under the same circumstances, or, from failing to do an act that a reasonably prudent manufacturer would have done under the same circumstances.

A defendant manufacturer must exercise "reasonable care" in marketing and distributing its product, to the extent that it has control, so as to take precautions against creating foreseeable risks of injury. What constitutes reasonable care will vary with the surrounding circumstances. Reasonable care is the care that a reasonably prudent manufacturer of handguns would exercise under the same or similar circumstances. When I refer to a manufacturer, I mean a defendant who manu-

factures handguns in this country or a defendant who imports handguns manufactured abroad.

There is negligence if a reasonably prudent manufacturer could foresee injury as a result of its conduct, and acted unreasonably in the light of what could be foreseen. There is no negligence if a reasonably prudent manufacturer could not have foreseen injury as a result of its conduct, or acted reasonably in the light of what could have been foreseen.

## PROXIMATE CAUSE

An act or omission is regarded as a proximate cause of an injury only if it was a substantial factor in bringing about the injury. There may be more than one proximate cause of an injury. If you find that a defendant's conduct was not a proximate cause of a plaintiff's injury, then that defendant is not liable to that plaintiff.

## PROXIMATE CAUSE—INTERVENING CAUSES

In each of these seven cases, the acts of the seven individual shooters constitute a proximate cause of the plaintiff's injuries. The defendants claim that the intentional criminal conduct of the shooters and others who committed criminal acts was the sole proximate cause of the shootings and murders in each of these seven cases. If you find that such criminal conduct was the sole proximate cause of the shootings in any of these cases, the plaintiff in such case may not recover.

The defendants claim that they are not responsible for any plaintiff's injuries because the injuries were caused by the criminal conduct of the shooter or others who committed criminal acts leading to the shooting. If you find that a defendant was negligent but that a plaintiff's injuries were caused by the act of a criminal or criminals, you may still find a defendant responsible for that plaintiff's injuries, if you also find that a reasonably prudent manufacturer in the defendant's situation, before the defendant allegedly committed its act of negligence, would have foreseen that an act of the kind committed by the criminal or criminals would be a probable result of a defendant's negligence. If you find that a reasonably prudent manufacturer would not have foreseen an act of the kind committed by the criminal or criminals as a probable consequence of its negligence, then the manufacturer is not responsible for the plaintiff's injuries and plaintiff may not recover.

## ALLOCATION OF FAULT—MARKET SHARE

If you find a defendant is responsible for the injury of any plaintiff, that defendant may be liable in an amount measured by its share of the national market for handguns. By national market share, I mean production in this country less exports, plus imports. There are three possible situations as to market share: First, it is not proven by any party that any particular manufacturer or one of a possible group of manufacturers manufactured the handgun in question. Second, that a particular manufacturer is proven by any party to have manufactured the handgun in question. And third, that it is proven by any party that only a limited number of manufacturers could have manufactured the handgun in question.

I remind you that other elements of the claim must be established—negligence and proximate cause—before you address this issue of market share.

1. If it is not proven (by any party) that a handgun manufactured by a particular manufacturer (see 2 below) or class of manufacturers (see 3 below) was used in the shooting of a particular plaintiff, liability must be assessed against each defendant on the basis of that defendant's percentage of national market share. Again,

by national market share, I mean percentage of guns manufactured less exports plus imports.

2. If it is proven (by any party) that a handgun manufactured by a particular manufacturer was used in the shooting of a particular plaintiff, you must assess 100% of the damages against that manufacturer. If that manufacturer is not a defendant, each of the defendants would have to be assessed a zero percentage of the national market share for that gun.

3. If a class of manufacturers, if found by you, (as for example, .25 caliber handgun manufacturers or 9 mm. handgun manufacturers), but not a *particular* handgun manufacturer (as in situation 2 above), is proven to have made the handgun used in the shooting of a particular plaintiff, you must assess the percentage share liability of each defendant manufacturing that class of handguns to be equal to that defendant's national market share of sales for that class of guns. For example, if you find it was a .25 caliber handgun or one with other class characteristics, that only four manufacturers, A, B, C and D, manufactured that type of handgun, and that each sold 25% of such guns nationally, you must find the percentage of liability against each defendant to be 25%. In this example, if only A, B, and C are defendants in this case, the plaintiff will recover only 75% of his damages.

Unless a particular manufacturer who is a defendant can be shown to have manufactured the gun in question (see situation 2 above), the total percentage of liability assessed against the defendant or defendants that can be held responsible may be less than 100% of the national market since some manufacturers are not defendants. Do not speculate as to why a particular manufacturer is not a defendant.

In assessing national market shares, you should take into account the fact that a gun manufactured in one year may not be used in a crime until some years later. It is the year of the sale by the manufacturer of the gun used in the shooting (as found by you) that is to be used in determining market share.

APPENDIX B—VERDICT FORM FOR STEPHEN
AND GAIL FOX AS COMPLETED BY JURY

VII. Stephen Fox and Gail Fox

 A. Was Defendant's marketing or distribution of handguns negligent?

 American Arms, Inc.
 Yes ✓ No ·

 Arcadia Machine & Tool, Inc.
 Yes ✓ No

 Beretta U.S.A. Corp.
 Yes ✓ No

 Browning Arms Company
 Yes No ✓

Bryco Arms
Yes ✓ No

Calico Light Weapons Systems, Inc.
Yes ✓ No

Charco, Inc.
Yes No ✓

Colt's Manufacturing Co., Inc.
Yes ✓ No

Davis Industries, Inc.
Yes No ✓

European American Armory Corp.
Yes No ✓

Freedom Arms Co.
Yes ✓ No

Glock, Inc.
Yes ✓ No

H & R 1871, Inc.
Yes No ✓

International Armament Corporation, d/b/a Interarms Industries Inc.
Yes ✓ No

Jennings Firearms, Inc.
Yes ✓ No

K.B.I., Inc.
Yes ✓ No

Navegar, Inc., d/b/a Intratec Firearms
Yes No ✓

Para–Ordnance Manufacturing, Inc.
Yes No ✓

Phoenix Arms, Inc.
Yes ✓ No

Sigarms, Inc.
Yes ✓ No

Smith & Wesson Corp.
Yes No ✓

Springfield, Inc.
Yes No ✓

Sturm, Ruger and Co., Inc.
Yes No ✓

Sundance Industries, Inc.
Yes ✓ No

Taurus International Manufacturing, Inc.
Yes ✓ No

Go no further as to those defendants for whom you answered "No." If you an- swered "No" as to all defendants, go no further.

II. Were Stephen Fox's injuries proximately caused by negligent marketing or distribution practices on the part of:

American Arms, Inc.
Yes ✓ No

Arcadia Machine & Tool, Inc.
Yes No ✓

Beretta U.S.A. Corp.
Yes ✓ No

Browning Arms Company
Yes No ✓

Bryco Arms
Yes No ✓

Calico Light Weapons Systems, Inc.
Yes No ✓

Charco, Inc.
Yes No ✓

Colt's Manufacturing Co., Inc.
Yes No ✓

Davis Industries, Inc.
Yes No ✓

European American Armory Corp.
Yes No ✓

Freedom Arms Co.
Yes No ✓

Glock, Inc.
Yes No ✓

H & R 1871, Inc.
Yes No ✓

International Armament Corporation, d/b/a Interarms Industries Inc.

Yes No ✓

Jennings Firearms, Inc.
Yes No ✓

K.B.I., Inc.
Yes No ✓

Navegar, Inc., d/b/a Intratec Firearms
Yes No ✓

Para–Ordnance Manufacturing, Inc.
Yes No ✓

Phoenix Arms, Inc.
Yes No ✓

Sigarms, Inc.
Yes No ✓

Smith & Wesson Corp.
Yes No ✓

Springfield, Inc.
Yes No ✓

Sturm, Ruger and Co., Inc.
Yes No ✓

Sundance Industries, Inc.
Yes No ✓

Taurus International Manufacturing, Inc.
Yes ✓ No

Go no further as to those defendants for whom you answered "No." If you answered "No" as to all defendants, go no further.

III. Apportion each defendant's share of liability for the plaintiff's damages only as to those defendants as to whom you answered "Yes" in both A and B. (The total need not equal 100%):

American Arms, Inc. .23%

Arcadia Machine & Tool, Inc. ____%

Beretta U.S.A. Corp. 6.03%

Browning Arms Company ____%

Bryco Arms ____%

Calico Light Weapons Systems, Inc. ____%

Charco, Inc. ____%

Colt's Manufacturing Co., Inc. ____%

Davis Industries, Inc. ____%

European American Armory Corp. ____%

Freedom Arms Co. ____%

Glock, Inc. ____%

H & R 1871, Inc. ____%

International Armament Corporation, d/b/a Interarms Industries Inc. ____%

Jennings Firearms, Inc. ____%

K.B.I., Inc. ____%

Navegar, Inc., d/b/a Intratec Firearms ____%

Para–Ordnance Manufacturing, Inc. ____%

Phoenix Arms, Inc. ____%

Sigarms, Inc. ____%

Smith & Wesson Corp. ____%

Springfield, Inc. ____%

Sturm, Ruger and Co., Inc. ____%

Sundance Industries, Inc. ____% .

Taurus International Manufacturing, Inc. **6.8%**

## D. Computation of Damages

### 1. Steven Fox

For each of the following elements of damage, state what dollar amount, if any, would compensate Steven Fox for the injuries and damages he sustained, as defined in the jury instructions:

(a) Past conscious pain and suffering, emotional distress, and the diminution of the quality of life **$2,000,000**

(b) Past disability

(c) Future conscious pain and suffering, emotional distress and diminution of the quality of life **$1,950,000**

(d) Future disability

(e) Future economic loss due to lost earnings or reduction in earning capacity

(f) Future medical expenses

### 2. Gail Fox

For each of the following elements of damage state what dollar amount, if any, would compensate Gail Fox for her damages, as defined in the jury instructions:

Loss of Services

Medical expenses

Reasonable value of nursing services **$50,000**

Cost of Upbringing and Education of Steven Fox To Age 18 from the Time of Shooting